# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 16, 2000 Session

# DON L. CULBREATH v. FIRST TENNESSEE BANK NATIONAL ASSOCIATION

**Appeal by Permission from the Court of Appeals, Western Section**
**Chancery Court for Shelby County**
**No. 101572     Floyd Peete, Jr., Chancellor**

---

**No. W1998-00426-SC-R11-CV - Filed May 18, 2001**

---

Don L. Culbreath (Culbreath) filed suit against Community First Bank (Community First) seeking compensatory and punitive damages.  Culbreath alleged that Community First fraudulently refused to pay Culbreath the proceeds of a new $150,000 loan that had been agreed upon by a bank officer and Culbreath and for which Culbreath had signed a demand note and deed of trust.  Instead, the bank used the deed of trust to serve as additional collateral for Culbreath's existing indebtedness to the bank.  Prior to trial, Community First merged with First Tennessee Bank, N.A. (First Tennessee), and First Tennessee was substituted for Community First as the defendant in the case.  The trial court found in favor of Culbreath and awarded $209,156 in compensatory damages.  After a bifurcated hearing on the issue of punitive damages, the court awarded Culbreath an additional $9,000,000 in punitive damages.  First Tennessee argues on appeal that as a successor corporation it should not be liable for punitive damages arising from Community First's actions.  We hold that First Tennessee is liable for the compensatory damages awarded by the trial court and that it is also liable for punitive damages arising out of Community First's pre-merger conduct.  However, we remand this case to the trial court for reassessment of punitive damages based upon the factors outlined in Hodges v. S.C. Toof & Co., 833 S.W.2d 896 (Tenn. 1992).

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part and Reversed in Part and Case Remanded for Further Proceedings.**

JANICE M. HOLDER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and FRANK F. DROWOTA, III, ADOLPHO A. BIRCH, JR., and WILLIAM M. BARKER, JJ., joined.

Andrew C. Clarke, C. Philip M. Campbell, R. Sadler Bailey, and Seymour S. Rosenberg, Memphis, Tennessee, for the plaintiff-appellant, Don L. Culbreath.

John C. Speer, Lang Wiseman, Leo Bearman, Jr., and Michael Cotter Patton, Memphis, Tennessee, for the defendant-appellee, First Tennessee Bank, N.A.

John E. Murdock, III, and Roger G. Jones, Nashville, Tennessee, for amici curiae, Tennessee Association of Business and Tennessee Bankers Association.

**OPINION**

The plaintiff, Don Culbreath, was the president of Southern Wholesale Motors, Inc., an automobile wholesale business in Shelby County. Culbreath had an ongoing business relationship with Community First Bank.[1] Culbreath had a line of credit with Community First in the amount of $300,000 that provided financing for Southern Motors' floor plan. This line of credit was secured by all of the vehicles owned by Southern Motors. Culbreath had a second line of credit (the "immediate credit line") in the amount of $150,000 that allowed Southern Motors to receive immediate credit when it deposited drafts on automobile sales into its checking account. After being credited to Southern Motors' account, each draft was forwarded to the purchaser's bank for payment. The purchaser's bank would then pay Community First. Community First was thereby paid the amount of the draft that had previously been credited to Southern Motors' account. If a draft was returned unpaid by the purchaser's bank, Community First debited Southern Motors' checking account the amount of the draft. Along with the draft, Southern Motors sent the title to the vehicle being sold to Community First as security for the draft.

In June 1990, Community First cancelled the immediate credit line and charged all outstanding drafts against Southern Motors' checking account. The bank's cancellation of the immediate credit line was, according to the bank, due to the number of drafts that had been returned unpaid. The bank's action resulted in an overdraft in Southern Motors' checking account of approximately $134,000. Culbreath discussed the overdraft and the cancellation of the immediate credit line with Jack Lampley, Vice President of Community First. Lampley agreed to a new loan to Southern Motors in the amount of $150,000. Culbreath and his wife, Evie Culbreath, both of whom had personally guaranteed Southern Motors' lines of credit, were to guarantee the new loan personally. In addition, Culbreath agreed to pledge his interest in a piece of real property, the "Brooks Road property," as collateral for the new loan.[2]

On July 2, 1990, Culbreath and his wife went to Community First to sign the closing papers for the new loan. The closing papers had been prepared by Community First's attorney, Dunlap Cannon, III. Culbreath and his wife each signed a demand note, a deed of trust (on Culbreath's interest in the Brooks Road property) and a "Consent to Pledge." However, Community First never made the $150,000 loan. Instead, it used the deed of trust as additional collateral for Southern Motors' prior obligations to the bank.

---

[1] The bank was formerly known as the Community Bank of Germantown but changed its name to Community First after this litigation began. For ease of reference, we refer to the bank as Community First.

[2] Culbreath and another businessman, James Altman, each owned a one-half interest in the Brooks Road property. Southern Motors owned no interest in the property.

Southern Motors eventually paid the $134,000 overdraft but was unable to pay the outstanding balance of the $300,000 line of credit. Southern Motors' inventory was liquidated to partially satisfy the outstanding balance, and the business ceased operations.

Community First demanded that Culbreath pay the $150,000 demand note secured by the deed of trust. When Culbreath did not pay on the note, the bank initiated a foreclosure proceeding on the deed of trust on Culbreath's interest in the Brooks Road property. Culbreath filed for bankruptcy protection. The first foreclosure proceeding ultimately was withdrawn by the bank when Culbreath agreed to make regular payments to the bank and withdrew his bankruptcy petition. When Culbreath later stopped making the agreed monthly payment, the bank initiated a second foreclosure proceeding. To avoid the foreclosure, Culbreath was forced to sell his one-half interest in the Brooks Road property to his business partner, James Altman, for $100,000.[3]

Culbreath filed suit against Community First in June 1992. In February 1995, Community First merged with First Tennessee. First Tennessee, which knew of the pending lawsuit at the time of the merger, was subsequently substituted for Community First as defendant in this case.

The case went to trial in August 1997. Lampley[4] testified at trial that he never intended to make a new loan to Culbreath and that he intended to use the deed of trust as additional collateral for Culbreath's prior obligations to the bank. Lampley denied telling the Culbreaths that the bank was making a new loan. Lampley's testimony was contradicted by the testimony of Don and Evie Culbreath, both of whom testified that Lampley had said that the loan would be a new loan. Lampley's testimony was also contradicted by other witnesses. Community First's attorney, Dunlap Cannon, III, testified that he had been instructed by Lampley to draw up documents for a new loan and that he would have drafted the documents differently had the transaction merely been for additional collateral for existing loans. Additionally, Culbreath called an expert witness, Martin Grusin. Grusin, a licensed attorney who serves as chief executive officer of United American Bank, testified that the documents signed by the Culbreaths were documents for a new loan and not for additional collateral. A representative of the Shelby County Registrar's Office testified that the bank paid transfer taxes on the transaction. He stated that the bank would not have had to pay transfer taxes if the transaction had been only to secure additional collateral for a pre-existing loan.

Concerning his damages, Culbreath testified that at the time he was forced to sell his interest in the Brooks Road property to his partner to avoid foreclosure, his share of the equity was $270,000. He therefore suffered damages in the amount of $170,000 as a result of the forced sale of the property. In addition, he incurred attorneys' fees defending the two foreclosure proceedings brought by the bank and also paid closing costs for the loan.

---

[3]Altman paid the bank $100,000 to release the deed of trust, and Culbreath quitclaimed his one-half interest in the property to Altman.

[4]Lampley was not employed by First Tennessee after the merger.

The trial court found that "the proof is overwhelming that the Defendant Bank promised Plaintiff a new loan and intentionally did not fund it, obtaining a third mortgage at closing and attempting a foreclosure of the property in 1991 and again in 1993." The trial court awarded Culbreath compensatory damages in the amount of $209,156 (Culbreath's $170,000 loss from the sale of the Brooks Road property, plus $38,000 in attorneys' fees resulting from the bank's two foreclosure attempts, and $1,156 in closing costs on the July 2, 1990 transaction).[5] The case was set for a separate hearing on the issue of punitive damages.

At the hearing on punitive damages, the parties stipulated to the admission into evidence of the two merger agreements pertaining to the merger of First Tennessee and Community First.[6] The parties also stipulated to First Tennessee's 1997 annual report, which indicated that First Tennessee's net worth was approximately $900,000,000. In addition, the court heard additional proof concerning Lampley's actions on behalf of Community First. At the conclusion of the hearing, the trial court found that under Hodges v. S.C. Toof & Co., 833 S.W.2d 896 (Tenn. 1992), punitive damages should be imposed. The court found that an award of 1% of First Tennessee's net worth was appropriate and therefore awarded $9,000,000 in punitive damages.

The Court of Appeals affirmed the award of compensatory damages but reversed the punitive damages award. The intermediate court concluded that "to assess punitive damages against First Tennessee would offend the policy announced by the Tennessee Supreme Court in Hodges. First Tennessee committed no post-merger acts that could be taken into consideration under the Hodges criteria in assessing punitive liability."

Culbreath filed an application for permission to appeal to this Court pursuant to Tenn. R. App. P. 11. We granted permission to appeal.

ANALYSIS

Culbreath contends that First Tennessee is liable for punitive damages based upon 12 U.S.C § 215a (1989), Tenn. Code Ann. § 48-21-108 (1995), and the merger agreement between the two banks. On the other hand, First Tennessee asserts that the Court of Appeals correctly held that assessing punitive damages against First Tennessee for the conduct of Community First violates the principles stated in this Court's decision in Hodges.[7] In the alternative, First Tennessee argues that

---

[5]The court also granted a judgment to the bank on its counterclaim against Culbreath and its third-party complaint against Evie Culbreath. The court awarded the bank $60,000 against the Culbreaths (as personal guarantors) for the outstanding balance of Southern Motors' $300,000 line of credit.

[6]One of the agreements pertained to the merger of the holding companies that owned the respective banks. The other agreement pertained to the merger of the two banks.

[7]First Tennessee also argues that Culbreath is not entitled to any damages – compensatory or punitive – because he failed to prove that he sustained any damage as a result of Community First's actions. The bank asserts that Culbreath could have sold his interest in the Brooks Road property on the open market rather than to his partner and thereby

(continued...)

the size of the punitive damages award violates due process, citing BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996).

## I. LIABILITY OF SUCCESSOR BANK FOR PUNITIVE DAMAGES

## A. FEDERAL BANK MERGER STATUTE

The merger between First Tennessee (a national bank) and Community First (a state bank) is governed by 12 U.S.C. § 215a. This statute provides, in pertinent part:

> (a) One or more national banking associations or one or more State banks, with the approval of the Comptroller, under an agreement not inconsistent with this subchapter, may merge into a national banking association located within the same State, under the charter of the receiving association. The merger agreement shall–
>
> . . . .
>
> (4) provide that the receiving association shall be liable for all liabilities of the association or State bank being merged into the receiving association.

The issue in this case – whether the words "all liabilities" includes liability for punitive damages – is one of statutory construction. The applicable principles of statutory construction of a federal statute are as follows:

> A "familiar canon of statutory construction is that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Moreover, "words will be interpreted as taking their ordinary, contemporary, common meaning," so that "[i]n construing a federal statute it is appropriate to assume that the ordinary meaning of the language that Congress employed accurately expresses the legislative purpose." Therefore, if the words of the statute are unambiguous, the judicial inquiry is at an end, and the plain meaning of the text must be enforced because "'courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'"

---

[7](...continued)
avoided selling the property at a loss. Based upon our review of the facts in the record, we find this argument to be without merit.

Hudson v. Reno, 130 F.3d 1193, 1199 (6th Cir. 1997), cert. denied, 525 U.S. 822, 119 S. Ct. 64, 142 L. Ed. 2d 50 (1998) (citations omitted).  In addition:

> [T]ext consists of words living "a communal existence," in Judge Learned Hand's phrase, the meaning of each word informing the others and "all in their aggregate tak[ing] their purport from the setting in which they are used."  Over and over we have stressed that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."

U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402, 418 (1993) (citations omitted).  Therefore, we must interpret the statute "as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." Cafarelli v. Yancy, 226 F.3d 492, 499 (6th Cir. 2000).

12 U.S.C. § 215a(a)(4) requires the merger agreement to state that the "receiving association" shall be liable for "all liabilities" of the bank merging into the receiving association.  Giving the words "all liabilities" their "ordinary, contemporary, common meaning" and "assum[ing] that the ordinary meaning of the language that Congress employed accurately expresses the legislative purpose[,]" we conclude that "all liabilities" means all liabilities.  We reach this conclusion not only based upon the ordinary meaning of the word "all" but also upon consideration of the whole statute.

The "all liabilities" provision of the federal bank merger statute is 12 U.S.C. § 215a(a)(4). The statute goes on to provide in § 215a(e):

> The corporate existence of each of the merging banks or banking associations participating in such merger shall be merged into and continued in the receiving association and such receiving association shall be deemed to be the same corporation as each bank or banking association participating in the merger.  All rights, franchises, and interests of the individual merging banks or banking associations in and to every type of property (real, personal, and mixed) and choses in action shall be transferred to and vested in the receiving association by virtue of such merger without any deed or other transfer.  The receiving association, upon the merger and without any order or other action on the part of any court or otherwise, shall hold and enjoy all rights of property, franchises, and interests, including appointments, designations, and nominations, and all other rights and interests as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, and committee of estates of lunatics, and in every other fiduciary capacity, in the same manner

and to the same extent as such rights, franchises, and interests were held or enjoyed by any one of the merging banks or banking associations at the time of the merger, subject to the conditions hereinafter provided.

12 U.S.C. § 215a(e) (emphasis added).

Under subsection (e), the corporate existence of Community First was "merged into and continued" in First Tennessee. Moreover, the statute requires that First Tennessee "be deemed to be the same corporation as [Community First]." Because Community First continues in First Tennessee and First Tennessee is "deemed to be the same corporation as [Community First]," it only follows that First Tennessee is liable for any punitive damages assessed for Community First's pre-merger conduct.

Subsection (e) also provides that "[a]ll rights, franchises, and interests of the individual merging banks or banking associations in and to every type of property (real, personal, and mixed) and <u>choses in action</u> shall be transferred to and vested in the receiving association by virtue of such merger without any deed or other transfer." (Emphasis added.) Because Community First's choses in action were transferred to and vested in First Tennessee, First Tennessee is authorized by the statute to sue any party against whom Community First had a cause of action. Assuming hypothetically that Community First had a valid cause of action against a defendant for both compensatory and punitive damages, subsection (e) would appear to allow First Tennessee to pursue that claim after the merger. If First Tennessee may pursue a claim for punitive damages that Community First had against another party, then logic dictates that the converse should also be true – First Tennessee should be liable for any punitive damages for which Community First would have been liable.

If we were to interpret "all liabilities" in 12 U.S.C. § 215a(a)(4) to exclude punitive damages, we would be ignoring the ordinary meaning of the word "all." In addition, such an interpretation would render subsection (a)(4) inconsistent with subsection (e).

B. TENNESSEE CORPORATE MERGER STATUTE

In addition to the federal bank merger statute, Culbreath relies upon Tenn. Code Ann. § 48-21-108(a)(3), pertaining to mergers of Tennessee corporations. Section 48-21-108(a)(3) provides: "All liabilities of each corporation or partnership that is a party to the merger shall be vested [at the effective time of the merger] in the surviving corporation or partnership." Again, Culbreath argues that "all liabilities" means <u>all</u> liabilities.

First Tennessee is owned by a holding company, First Tennessee National Corporation. At the time of the merger, Community First was also owned by a holding company, Community Bancshares, Inc. (Both holding companies were Tennessee corporations.) The merger agreement between the two holding companies provided that First Tennessee National Corp. would be the

"surviving corporation, pursuant to the provisions of, and with the effects provided in, the Tennessee Code." Additionally, the choice-of-law provision of the holding companies' merger agreement stated that the agreement "shall be governed by, and interpreted in accordance with, the laws of the State of Tennessee."

While the merger of the two holding companies is clearly governed by state law, it is not so clear that the merger of the two subsidiary banks (which occurred via a separate merger agreement) is controlled by the Tennessee corporate merger statute. See Tenn. Code Ann. § 45-2-1302(a) (2000) (governing merger of state bank into national bank and providing that "[t]he action to be taken by such merging . . . bank . . . and its rights and liabilities . . ., shall be the same as those prescribed for national banks at the time of the action by the laws of the United States and not by the laws of this state"). Because the parties have not addressed the effect of § 45-2-1302(a) on this case and because our construction of the federal bank merger statute makes it unnecessary to do so, we do not decide whether Tenn. Code Ann. § 48-21-108(a)(3) is applicable and, if so, whether it imposes liability on a successor corporation for punitive damages.

## C. BANKS' MERGER AGREEMENT

In addition to the federal bank merger statute and the Tennessee corporate merger statute, Culbreath relies upon the merger agreement between First Tennessee and Community First. Consistent with the requirement of 12 U.S.C. § 215a, the merger agreement between the two banks (not the holding companies' merger agreement) provided that First Tennessee would be liable for "all liabilities" of Community First. In fact, the merger agreement was even more explicit than the federal bank merger statute. The merger agreement provided that at the effective time of the merger, First Tennessee "shall be liable for all liabilities of each of the participating banks and all deposits, debts, liabilities, obligations and contracts of each of the participating banks, whether material or immaterial, accrued, contingent or otherwise . . . shall become those of the Association, and shall not be released or impaired by the merger, and all rights of creditors and other obligees . . . shall be preserved unimpaired." (Emphasis added.) As one court has stated in a similar case, "It is difficult to imagine a more comprehensive statement of assumption of liability than that which is contained in this merger agreement." Douglas v. Bank of New England/Old Colony, N.A., 566 A.2d 939, 941 (R.I. 1989) (holding successor national bank liable for punitive damages judgment against bank that merged into successor national bank).

Under the merger agreement, the bank expressly assumed "all liabilities" ("whether . . . accrued, contingent or otherwise"). First Tennessee is therefore liable for the punitive damages arising from Community First's pre-merger conduct. Otherwise, Community First's contingent liability to Culbreath at the time of the merger would have been "released or impaired" in contravention of the express terms of the agreement.

## II.  FIRST TENNESSEE'S ARGUMENTS

### A.  "INNOCENT SUCCESSOR" ISSUE

First Tennessee's primary argument is that an "innocent successor" corporation should not automatically be held liable for punitive damages attributable to a company that merged into the successor corporation.  The bank cites a number of products liability cases from other jurisdictions and a number of law review articles in arguing that policy considerations weigh against a rule of automatic liability.  See, e.g., Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir. 1988); Drayton v. Jiffee Chem. Corp., 591 F.2d 352 (6th Cir. 1978); Davis v. Celotex Corp., 420 S.E.2d 557 (W. Va. 1992); Martin v. Johns-Manville Corp., 469 A.2d 655 (Pa. Super. Ct. 1983), vacated on other grounds, 494 A.2d 1088 (Pa. 1985); Barry Levenstam & David Lynch, Punitive Damages Awards Against Successor Corporations: Deterrent of Malicious Torts or Legitimate Acquisitions? 26 Tort & Ins. L.J. 27 (Fall 1990); Lynda G. Wilson, Corporate Successor Liability for Punitive Damages in Products Liability Litigation, 40 S.C. L. REV. 509 (Winter 1989).  The bank argues that the Court of Appeals correctly held that First Tennessee is not liable to Culbreath for punitive damages because First Tennessee (the "innocent successor") did not participate in any wrongdoing against Culbreath.

First Tennessee's argument on this point is faulty for at least two reasons.  First, the federal bank merger statute and the two banks' merger agreement control in this case.  The products liability cases and law review articles relied upon by First Tennessee are therefore inapposite.  Moreover, the bank's policy arguments are arguments that should be directed to Congress, which enacted the federal bank merger statute.

Second, the bank's argument that punitive damages are not warranted based upon an application of the Hodges criteria to First Tennessee is based upon the premise that First Tennessee, post-merger, is separate and distinct from Community First.  As discussed above in relation to 12 U.S.C. § 215a(e), that premise is false.  Under the federal bank merger statute, Community First became part of and continued in First Tennessee.

First Tennessee, after the merger, is not a separate, "innocent" entity from Community First.  As a result of the merger, Community First became part of First Tennessee, and First Tennessee assumed all liabilities of Community First, including the liability for punitive damages.  If Hodges were applied only to First Tennessee's actions after the merger, First Tennessee effectively could avoid the very liability imposed pursuant to the federal bank merger statute and the banks' merger agreement.  Consequently, in determining whether punitive damages are appropriate, the trial court correctly rejected First Tennessee's argument that it is a separate, innocent successor.

That determination, however, does not end our inquiry.  We next consider whether the trial court complied with the principles stated in Hodges in assessing punitive damages.

### B.  APPLICATION OF PRINCIPLES STATED IN HODGES

The Court in <u>Hodges</u> held that punitive damages may be awarded only if a defendant has acted 1) intentionally, 2) fraudulently, 3) maliciously, or 4) recklessly. "[B]ecause punitive damages are to be awarded only in the most egregious of cases," we held that a plaintiff must prove a defendant's wrongful conduct by "clear and convincing" evidence. <u>Id.</u>

In a case in which punitive damages are sought the trial court must, upon motion of the defendant, bifurcate the trial of the case. <u>Hodges</u>, 833 S.W.2d at 901. The court first conducts a hearing on "(1) liability for, and the amount of, compensatory damages and (2) liability for punitive damages in accordance with the standards announced above." <u>Id.</u> If the court decides that punitive damages are to be imposed, the court then immediately conducts a second phase of the trial to determine the amount of punitive damages. <u>Id.</u> As we stated in <u>Hodges</u>:

> During this second phase, the factfinder shall consider, to the extent relevant, at least the following:
>
> (1) The defendant's financial affairs, financial condition, and net worth;[8]
>
> (2) The nature and reprehensibility of defendant's wrongdoing, for example
>
>> (A) The impact of defendant's conduct on the plaintiff, or
>>
>> (B) The relationship of defendant to plaintiff;
>
> (3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;
>
> (4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;
>
> (5) The expense plaintiff has borne in the attempt to recover the losses;
>
> (6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

---

[8]First Tennessee and the amici curiae, the Tennessee Bankers Association and the Tennessee Association of Business, assert in their respective briefs that any award of punitive damages should have been based upon the net worth of Community First at the time of the merger instead of First Tennessee's net worth. We decline to decide this issue because First Tennessee waived the issue by failing to raise it in the trial court. Tenn. R. App. P. 36(a). On remand, however, the trial court may properly consider this issue in assessing punitive damages.

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

Hodges, 833 S.W.2d at 901-02. In applying these factors, the trier of fact must consider "that the primary purpose of a punitive award is to deter misconduct, while the purpose of compensatory damages is to make plaintiff whole." Id. at 902.

In jury cases the trial judge must review the jury's award of punitive damages and "clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed." Id. In non-jury trials, such as the pending case, the trial judge's findings of fact and conclusions of law are equally essential. In the absence of sufficient findings of fact and conclusions of law as to each of the relevant Hodges criteria, an appellate court cannot adequately review the trial court's award of punitive damages.

With the foregoing principles in mind, we turn to an analysis of the trial court's order of judgment assessing punitive damages against First Tennessee. We begin by noting that the trial court failed to follow the trial procedure established in Hodges. In the first phase of the trial, the court ruled only on First Tennessee's liability for compensatory damages. The court reserved both the issue of liability for punitive damages and the issue of the amount of any such damages for the second phase of the trial. In the second phase of the trial, the court found First Tennessee liable for punitive damages and set the amount of punitive damages at $9,000,000.00.[9] While the trial court failed to follow the trial procedure stated in Hodges, neither party has raised this error as an issue on appeal. We note, however, that for the sake of consistency between jury trials and non-jury trials, the trial procedure should be the same in both types of cases.

We next consider the trial court's decision to award punitive damages. We find that the trial court's findings of fact and conclusions of law amply support the imposition of punitive damages. The trial court made extensive findings of fact concerning the reprehensibility of Community First's actions. These findings support the trial court's conclusion that the conduct of Community First was

_____

[9] We note that the trial court calculated its award of punitive damages based upon 1% of First Tennessee's net worth. We emphasize that on remand the trial court must support the award of punitive damages with findings of fact and conclusions of law based upon the Hodges factors. See Coffey, 929 S.W.2d at 328-31.

-11-

both intentional and fraudulent. These findings of fact and conclusions of law, however, are not sufficient to support the <u>amount</u> of punitive damages assessed by the trial court because the findings and conclusions fail to adequately address all of the relevant factors required by <u>Hodges</u>. <u>Id.</u>

In order to "clearly demonstrate a consideration of all relevant factors," the court's findings of fact and conclusions of law should explicitly refer to each of the factors listed in <u>Hodges</u>, as well as to any other factors supporting the award of punitive damages. <u>Id.</u> (stating, "the factfinder shall consider, to the extent relevant, <u>at least</u> the following. . . [listing the nine factors].") (emphasis added). <u>See</u> <u>Coffey</u>, 929 S.W.2d at 329-30 (quoting the trial court's extensive findings of fact and conclusions of law as to each individual factor listed in <u>Hodges</u>). The trial court's findings of fact and conclusions of law in the pending case did not address each of the <u>Hodges</u> factors individually and are therefore insufficient. We therefore reverse the award of punitive damages and remand this case to the trial court. On remand, the trial court will apply the factors outlined in <u>Hodges</u> and will make appropriate findings of fact and conclusions of law in arriving at an award of punitive damages.[10]

## CONCLUSION

The federal bank merger statute is unambiguous. It required the two banks' merger agreement to state that First Tennessee would be liable for "all liabilities" of Community First at the effective time of the merger. As required by the federal statute, the merger agreement stated that First Tennessee "shall be liable for all liabilities" of Community First, including "contingent" liabilities, and that Community First's liabilities "shall not be released or impaired by the merger." Under both the federal bank merger statute and the merger agreement, we hold that First Tennessee is liable for the punitive damages assessed by the trial court for Community First's fraudulent conduct against the plaintiff, Don L. Culbreath.

The trial court correctly held that First Tennessee is liable for punitive damages. In arriving at the amount of punitive damages, however, the trial court failed to make findings of fact and conclusions of law adequately addressing each of the relevant factors listed in <u>Hodges</u>.

We affirm that portion of the Court of Appeals' judgment affirming the award of compensatory damages. We reverse the intermediate court's reversal of the award of punitive damages. We vacate, however, the trial court's award of punitive damages and remand to the trial court. On remand, the trial court shall consider the record, take such additional evidence it deems necessary, and shall apply the factors outlined in <u>Hodges</u> to arrive at an award of punitive damages.

The costs are taxed to First Tennessee Bank, N.A.

---

[10]Having found that this case must be remanded for proper application of the <u>Hodges</u> factors, we decline to address First Tennessee's alternative argument that the size of the punitive damages award violates due process. However, First Tennessee is not precluded from raising this issue on remand.

_____
JANICE M. HOLDER, JUSTICE