NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0154n.06
Filed: February 25, 2005

No. 03-6429

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

GEORGE WINKLER, FLOYD E. BROWN,
DEIDRE W. BROWN, JAMES A. THAGARD,
FRANCES S. THAGARD, THOMAS F.
HUNTINGTON, SUSAN K. HUNTINGTON,

    Plaintiffs-Appellees,

       v.

FRANK PETERSILIE; CENTRAL FLORIDA
CAPITAL ENTERPRISES, INC.,

    Defendants-Appellants.

On Appeal from the United
States District Court for the
Eastern District of Tennessee

———————————————————————/

**Before:**     **GUY and ROGERS, Circuit Judges; DOWD, District Judge.**[*]

    **RALPH B. GUY, JR., Circuit Judge.**     Defendants appeal from the judgment entered in favor of the plaintiffs following a nonjury trial on claims and counterclaims arising from a dispute over the plaintiffs' right to access and use Watauga Lake, which is located on abutting property owned by defendant Central Florida Capital Enterprises, Inc. (CFCE). Rejecting the competing claims of trespass as well as the plaintiffs' claims for conversion, the district court found CFCE vicariously liable for malicious destruction of plaintiffs'

---

[*]The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

property and awarded a total of $33,525 in damages. That amount was offset by an award of $1,000 to CFCE to cure the encroachment of a portion of a patio constructed by plaintiffs Susan and Thomas Huntington. The district court awarded punitive damages against Frank Petersilie, a director, principal shareholder and CEO of CFCE, totaling $200,000. The district court also found Petersilie liable for outrageous conduct (or intentional infliction of emotional distress) and awarded plaintiffs a total of $100,000 in compensatory damages.

Defendants first challenge the district court's determination that plaintiffs' easements included the right to build walkways, stairs, and docks as permitted by the Tennessee Valley Authority (TVA). Petersilie argues that the evidence was insufficient to establish liability to plaintiffs for outrageous conduct or to support the award of compensatory and punitive damages. Without denying it may be held vicariously liable for Petersilie's actions, CFCE seeks reversal of the judgment in favor of the Huntingtons for malicious destruction of property and the order transferring property to the Huntingtons to cure the encroachment. After a review of the record and the arguments presented on appeal, we **REVERSE** the judgments in favor of plaintiffs on their claims of outrageous conduct and **AFFIRM** in all other respects.

## I.

All of the property at issue in this case was once part of a single tract of land owned by Betty Managoff located in Johnson County, Tennessee. A portion of that land was permanently flooded after the TVA constructed a dam across the Watauga River pursuant to a Flowage Easement dated March 11, 1948, granting the TVA permanent easement rights to land lying below elevation 1980' Mean Sea Level (MSL) (TVA 1980 elevation line). The

Flowage Easement expressly granted the TVA the right to permanently overflow the land, to enter and clear the land of anything that would interfere with navigation or flood control, and to "excavate, erect structures, and do such other work as is desirable in connection with the needs of navigation." There is no dispute that TVA approval is required to construct, operate or maintain any obstructions on property in the TVA's custody and control, including not only TVA-owned land but also land subject to TVA flowage easements. The TVA also has authority to cancel permits and require the removal of any structure on such land.

Managoff's property lay beneath and on both sides of a part of Watauga Lake known as Cobbs Creek Cove. She operated a fishing camp on one side and developed a subdivision on the other. The plat for the Managoff Subdivision, recorded with the county in 1966, described each lot by metes-and-bounds and noted the southeastern border of those lots to be the "TVA 1980 elevation." Although the TVA's easement extends up to the TVA 1980 elevation line, the waters of Watauga Lake have never been that high. The waters have fluctuated between an all-time high water mark of 1963' MSL and a low water mark of between 1930' and 1940' MSL. A second plat of the same date showed the boundary to be the TVA 1960 elevation line, but that plat was never recorded.[1]

Plaintiffs and their predecessors purchased multiple lots in the Managoff Subdivision before Managoff sold the tract of property on which the lake is located to CFCE's predecessors in title. Specifically, plaintiffs Floyd and Deidre Brown owned lots 7, 8, and 9 (the Browns); James and Frances Thagard owned lots 13, 14, and 15 (the Thagards);

---

[1]Plaintiffs have abandoned any claim to ownership of property below the TVA 1980 elevation line based on the unrecorded plat, errors in the placement of boundary markers, or adverse possession.

George Winkler owned lots 16 and 17 (Winkler); and Thomas and Susan Huntington owned lots 18, 19 and 20 (the Huntingtons). The deeds for these lots expressly granted either (1) "the right of egress and ingress to and from said lot and extending to the waters of Watauga Lake on the southeasterly side thereof, which rights shall be coextensive with the width of said lot and extending to said lake"; or (2) "water front privileges adjacent to the aforesaid property with the free right to ingress and egress along the 1980 TVA elevation line." Each deed also granted all appurtenances appertaining to those lots.

The plaintiff property owners all obtained permits from the TVA to erect or maintain stairs and floating docks within the TVA's Flowage Easement. Pursuant to those permits, all the plaintiffs, except for the Huntingtons, erected or maintained stairs and docks extending from their property into Watauga Lake. The undisputed evidence showed that the slope from the plaintiffs' lots to the water was steep and rocky, with several lots having an incline of as much as 60 degrees. One witness, a former owner of lot 9, testified that the slope was so steep that one could not walk up from the lake without holding onto the trees. Plaintiffs testified that it was difficult, if not dangerous, either to access the lake from their property without stairs or to get in or out of a boat without a dock.

CFCE's predecessors in interest, Charles and Edith Weathers, purchased the property under the lake and extending up to the TVA 1980 elevation line. They were also parties to state court litigation brought by the owner of lot 11, which is not owned by any of the plaintiffs in this case. Managoff was deposed during that litigation, but died before this case was commenced. An agreed judgment was entered declaring an easement on what is now CFCE's property allowing the owner of lot 11 to build stairs and a dock as permitted by the

TVA and ordering that the Weathers not attempt to interfere with the TVA's permitting decisions. That judgment also stated, however, that it did not affect the rights of the Weathers with respect to any other lots in the Managoff Subdivision. The final modified judgment in that case was entered in July 1992.[2]

CFCE bought the property in September 1999, and Petersilie began managing the marina. Petersilie insisted that plaintiffs did not have the right to build or maintain stairs, anchor floating docks, or otherwise access Watauga Lake without paying rent to CFCE. Over the next two years, Petersilie directly confronted some of the plaintiffs on their docks and told them they could not swim, boat, or use the lake unless they paid CFCE. Petersilie had "no trespassing" signs posted along the TVA 1980 elevation line. In September 2001, Petersilie directed that the stairs extending below the TVA 1980 elevation line be cut off with a chain saw, the wood piled on the docks, and the docks cut loose and towed outside the cove. Only the Huntingtons did not have stairs or a dock at that time. Petersilie had the TVA 1980 elevation line spray-painted, and docks placed in front of the plaintiffs' lots to block their access to the lake. Plaintiffs testified that they felt threatened by Petersilie's actions and had been denied their right to use the lake since September 2001.

The Browns paid dock fees to CFCE's predecessor until 1999, when they secured

---

[2]Managoff testified that in granting "waterfront privileges" she intended that the property owners would be able to "walk down to the water to swim or fish, or if somebody wanted to drop them off." She also explained that she understood nothing could be permanently placed below the TVA 1980 elevation line because that property was subject to the TVA's Flowage Easement. The magistrate judge ruled before trial in this case that Managoff's deposition was not admissible because Tennessee law does not allow the admission of parol evidence to vary or explain the terms of an agreement when the ambiguity is *patent*. *Coble Sys., Inc. v. Gifford Co.*, 627 S.W.2d 359, 362 (Tenn. Ct. App. 1981). Defendants offered Managoff's deposition into evidence in this case. The district judge received the deposition, indicating he would determine whether it was admissible, but did not refer to it in his written decision on the merits.

their own permit from the TVA.  In the spring of both 2000 and 2001, Petersilie confronted

Floyd Brown on his dock, insisted that the state court judgment relating to lot 11 was invalid,

demanded that the Browns pay rent to CFCE, and threatened to have their dock removed.

"No trespassing" signs were posted, but they continued to use the lake.

One Sunday afternoon, the Browns were out boating when they were stopped by a

Tennessee Wildlife Officer and detained for an hour at defendant's marina on a trespassing

complaint.  Plaintiffs' counsel wrote to Petersilie on behalf of the Browns and warned against

taking the "self-help" measures he had been threatening to take.  No further action was taken

by Petersilie until their stairs were destroyed, the dock removed, and the property line spray-

painted in September 2001.  Diedre Brown testified that she felt stress, fear, and harassment

as a result of Petersilie's actions.

The Thagards originally purchased five lots, two of which were sold to George

Winkler.  The Thagards specifically chose property with waterfront privileges so they could

swim, fish, and keep their boat.  After obtaining TVA permits to built three sets of stairs and

docks in 1995, James Thagard hired some help and started building his first set of stairs.  He

completed three sets of stairs and two docks without receiving any complaints.

On September 7, 2001, however, a man confronted Thagard on his dock, told him that

he was trespassing on private property and said there was no "ingress or egress" allowed to

the lake.  The next day, Thagard returned to the property to have a picnic and found his steps

had been cut off with a chain saw and the property line had been spray-painted.  He testified

that he was deeply affected by the destruction of steps he had built and by having lost the use

of the lake in his retirement.

When George Winkler bought his two lots from the Thagards, a dock and two sets of stairs had already been built and the TVA permits were transferred into his name. Shortly after the closing, Petersilie confronted Winkler out on the dock, warned Winkler that he was trespassing, and told Winkler he could not use the lake. According to Winkler's wife, Petersilie told them they could not swim in the lake and threatened to have them arrested if they did. In July 2001, Petersilie pinned the plaintiffs' docks in with a larger dock before agreeing to move it. In August 2001, Petersilie again accused Winkler of trespassing, threatened to build a barricade on the property line, and declared that he would spend $5 million to keep Winkler off the lake. A month later, Winkler's steps were cut down and the dock towed away.

The Huntingtons purchased their lots for camping and lake access, but they were the steepest of all the lots. As a result, Thomas Huntington built a roadway down to a concrete patio. The patio, built between November 2000 and June 2001, was anchored to the rocks with steel pins and constructed using steel I-beams and concrete. Although they had a permit from the TVA, the Huntingtons had not yet built stairs or a dock below the TVA 1980 elevation line. Even so, Petersilie had signs posted at and paint sprayed along the boundary of the Huntingtons' property. James Huntington testified that this conduct, which he characterized as "acts of terror," caused them to postpone construction of stairs and a dock.

Placement of the patio was based on markers left from a previous survey, which it turned out did not accurately mark the boundary line. A surveyor testified that the patio encroached onto CFCE's property by about two feet, or a rectangle of .005 acres. He prepared a plat showing that the purchase of .021 acres, or 215.96 square feet, would cure

the encroachment. The county assessor testified that the assessed value of lots in that area varied between $1.60 and $1.93 per square foot and that a special assessment applied to lake property. At $1.93 per square foot, the value of the encroached property would be $418.80. The district court found this would not be sufficient to compensate CFCE, but found $1,000 would be a fair value.

Petersilie testified, in an attempt to explain his actions, that he had been unable to get liability insurance for the marina because he did not have control over the plaintiffs' steps or docks. Also, Petersilie admitted that he directed the removal of the stairs and docks, but claimed he did so only after being told he could by someone at the Corps of Engineers. The district court expressly found that Petersilie was not a credible witness, had produced no evidence concerning his efforts to obtain liability insurance, and had offered no evidence to substantiate the claim that he was authorized by the Corps of Engineers to destroy the plaintiffs' property. The district court also found Petersilie's claim that he did not know the amount of his own net worth or the marina's income to be unbelievable. Petersilie admitted that he had failed to include between $250,000 and $350,000 in cash on financial statements he provided to the plaintiffs; that CFCE had no certificate of authority to do business in the State of Tennessee; and that CFCE did not apply for transfer of the TVA permits until 2002.

A bench trial was held in March 2003, and the district court issued a written decision in September 2003. Judgment was entered against defendants declaring that the plaintiffs' easements permit the free right of ingress and egress to the waters of Watauga Lake through any reasonable means, including the building of walkways, stairs, and docks as permitted by

the TVA, and to engage in any activity on the waters of Watauga Lake permitted by the TVA.

With respect to CFCE's vicarious liability, the district court found the intentional malicious destruction of property at Petersilie's direction constituted unlawful interference with the reasonable use of the plaintiffs' easements. Damages were awarded as follows based on the cost of replacing the stairs that were cut down and diminution in value of the Huntingtons' property: $9,860 to the Browns; $7,350 to the Thagards; $11,315 to George Winkler; and $5,000 to the Huntingtons. To cure the encroachment, the award of damages to the Huntingtons was offset by $1,000 in exchange for transfer of the encroached property to the Huntingtons.

Petersilie was found personally liable for outrageous conduct, and compensatory damages of $25,000 was awarded to each couple and to Winkler for a total of $100,000. Finally, applying Tennessee law, the district court awarded punitive damages of $50,000 to each couple and to Winkler for a total of $200,000. This appeal followed.

## II.

### A.     Plaintiffs' Easements

At the outset, we must resolve defendants' central claim, that the district court erred in finding plaintiffs had the right to build and maintain stairs and docks below the TVA 1980 elevation line both as a result of the permits issued by the TVA and pursuant to the easement contained in the deeds. We review a district court's findings of fact under Fed. R. Civ. P. 52(a) for clear error and its determination of a question of law *de novo*. *See Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985); *Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304,

308 (6th Cir. 1988).

There is no dispute that permits are required from the TVA in order to lawfully construct any structure on property subject to the TVA's Flowage Easement or that the TVA may cancel permits and require removal of any structure on such property. The district court also emphasized that the TVA's statutory powers include the authority to convey by deed, lease, or otherwise, real property in the possession of or under the control of the TVA to any person for the purpose of recreation. *See* 16 U.S.C. § 831c(k)(a). In this case, however, defendants argue and plaintiffs agree that the permits expressly stated that their issuance did not constitute a conveyance by the TVA of any property or interest in any property covered by or used in connection with the approved project. As such, plaintiffs do not rely on the permits to establish their easement rights, but only to demonstrate that they had the required approval of the TVA to place stairs and docks within the TVA's Flowage Easement.

Instead, plaintiffs ask that we affirm based on the district court's further determination that the deeds granted riparian rights that included the right to construct walkways, stairs, and docks as permitted by the TVA. It is true, as defendants argue, that a riparian owner is ordinarily one who owns land bounded by, abutting, or adjacent to a lake or river. *The Pointe LLC v. Lake Mgmt. Ass'n, Inc.*, 50 S.W.3d 471, 475 (Tenn. Ct. App. 2000). In *The Pointe*, the court held that when property adjacent to water is conveyed along with "all appurtenances," a presumption arises that the conveyance includes the right to the use and enjoyment of the water unless the terms of the deed or description of the property expressly indicates to the contrary. *Id.* Through this presumption, riparian rights were found to arise in the form of an implied easement.

While plaintiffs' lots do not abut Watauga Lake, the deeds to those lots were not silent concerning the plaintiffs' right to the use and enjoyment of the lake. Rather, the deeds expressly granted the lot owners either (1) the right to free ingress and egress to the lake across the full width of the lot at the TVA 1980 elevation line and extending to the waters of Watauga Lake, or (2) the right to waterfront privileges adjacent to the plaintiffs lot with the free right of ingress and egress along the TVA 1980 elevation line. We agree with the district court that these deeds expressly conveyed riparian rights through an easement for free access and use of Watauga Lake. *Bradley v. McLeod*, 984 S.W.2d 929, 934 (Tenn. Ct. App. 1998) (an easement is an interest in another's property that confers an enforceable right to use the property for a specified use). Riparian rights are not unlimited, but must be reasonable under the circumstances. *See Stanley v. Ring*, No. W2001-00950, 2002 WL 1751409, at *4 (Tenn. Ct. App. Mar. 20, 2002) (unpublished decision). The undisputed evidence supports the district court's further finding that the manner in which the plaintiffs exercised their rights by constructing stairs and docks was both reasonable under the circumstances and done pursuant to permits issued by the TVA.

Defendants suggest that these lots were merely "lake view" lots with a right-of-way easement that did not grant riparian rights, urging that we follow *Gwynn v. Oursler*, 712 A.2d 1072 (Md. App. 1998). In *Gwynn*, the Maryland appellate court stated that a "right-of-way to a body of water, alone, does not entitle the grantee the right to construct a dock or pier." *Id.* at 1075. The two-part analysis adopted in *Gwynn* requires a court to first examine the deed to determine whether it grants or denies riparian rights. If it grants such rights, the language of the deed controls. If the deed is ambiguous, the court may then consider parol

or other extrinsic evidence to discover the grantor's intent.

The deed at issue in *Gwynn*, unlike the deeds in this case, granted a general right-of-way for ingress and egress without describing whether it was intended to provide access to the river or the roadway or both. The trial judge found the deed did not expressly grant or deny riparian rights, received additional evidence concerning the intention of the grantor, and found that the right-of-way was intended only to provide access to the road. Without attempting to determine whether the Tennessee courts would follow *Gwynn* or whether it would conflict with Tennessee law to allow parol evidence to explain a patent ambiguity, we find that application of *Gwynn* would not alter the outcome in this case because the plaintiffs' deeds expressly grant riparian rights through an easement for access to the lake and/or waterfront privileges.

Accordingly, we affirm the declaration of rights and the injunction prohibiting defendants and their successors from interfering with those easement rights.[3]

## B.     Malicious Destruction of Property and Interference with Easement Rights

CFCE does not appeal from either the determination that it was vicariously liable for Petersilie's actions or the amount of damages awarded to the Browns, the Thagards, or Winkler to replace the stairs cut down at Petersilie's direction. With respect to the award of $5,000 to the Huntingtons, however, defendants argue that no personal property was actually destroyed and there was no evidence establishing the diminution in value resulting from the denial of access to the lake.

---

[3]Moreover, even if we were to look beyond the deeds, it is not clear that Managoff's deposition testimony would establish that she did not intend to grant the right to build stairs or docks even if they were permitted by the TVA.

The district court found that the effect of the intentional destruction of plaintiffs' personal property was the interference with the easement holders' enjoyment and use of their easements. Under Tennessee law, the owner of a subservient estate may be liable in damages for interference with the easement holder's use and enjoyment of the easement. *See Rector v. Halliburton*, No. M1999-02802, 2003 WL 535924, at \*9 (Tenn. Ct. App. Feb. 26, 2003) (unpublished decision). In choosing the correct measure of damages for such interference, courts must look to the particular nature of the injury and may appropriately measure damages by any diminution in the value of the easement holder's property, the cost to return the easement to its previous condition, or the difference in the value of the easement before the interference and after being obstructed. *Id*. at \*10.

Finding interference with the Huntingtons' easement rights, the district court concluded that the proper measure of damages would be the diminution in value of the easement during the two years before trial that they were denied access to the lake. As the trier of fact, it was within the district court's purview to decide that $5,000 would properly compensate for that loss. We find no error in this regard.

As noted earlier, that award was offset by $1,000 to cure the encroachment of the patio constructed by the Huntingtons. CFCE argues that the district court abused its discretion by not ordering the Huntingtons to remove that portion of the patio that extended onto CFCE's property. In the same breath, CFCE concedes that an appropriate equitable remedy for encroachment of a building onto the property of another may be to award damages to the owner. *See Morrison v. Jones*, 430 S.W.2d 668 (Tenn. Ct. App. 1968).

While CFCE asserts that there was nothing in the record to suggest the concrete patio

could not be severed at the property line, there was also no evidence offered that it could. The record indicates that the district court heard testimony concerning the construction of the patio, the extent of the encroachment, and Huntington's reliance on markers left from an earlier survey. It was well within the sound discretion of the trial court to determine whether the equitable remedy of injunction should be granted to cure an encroachment. *Id*. CFCE has not demonstrated an abuse of that discretion.

## C.     Outrageous Conduct

Compensatory damages of $25,000 each were awarded to the Browns, the Thagards, the Huntingtons, and Winkler on the plaintiffs' claim of "outrageous conduct," which is the same as intentional infliction of emotional distress. To establish a claim for outrageous conduct under Tennessee law, a plaintiff must prove that (1) the conduct complained of was intentional or reckless, (2) the conduct was so outrageous as to be intolerable in a civilized society, and (3) the conduct resulted in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Petersilie, who was found personally liable on this claim, argues that the evidence was insufficient to establish the second or third elements of this tort. This is a question of law, which we review *de novo*. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 231 (Tenn. Ct. App. 1999).

The following threshold has been adopted in Tennessee to determine whether the conduct was "outrageous":

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous

in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Bain*, 936 S.W.2d at 623 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

Petersilie argues that his conduct did not rise to this level because he acted on a genuine good faith belief that plaintiffs did not have the right to maintain stairs or docks in the easement. While the evidence supported the district court's finding that Petersilie acted in deliberate contravention of the plaintiffs easement rights through a continuing course of confrontation and harassment, that conduct was not so outrageous in character and so extreme in degree as to be considered intolerable in a civilized society. In *Rector*, for example, the defendant's campaign of harassment in an attempt to intimidate the plaintiff into relinquishing her easement rights, although condemnable, was found not to rise to the level of extreme and outrageous conduct. *Rector*, 2003 WL 535924, at *8. (reversing judgment for plaintiff on the claim of outrageous conduct). *Cf. Levy v. James C.D.*, No. M2002-02730, 2004 WL 1534185, at *15-17 (Tenn. Ct. App. July 9, 2004) (unpublished decision) (campaign of intimidation over property dispute with neighbor, which included angry profane confrontations, death threats, and shots being fired, rose to the level of outrageous conduct).

With respect to the third element, serious mental injury, a plaintiff must show the defendant's conduct caused so much mental distress that a reasonable person would be unable to cope. *Ramsey v. Beavers*, 931 S.W.2d 527, 532 (Tenn. 1996). Expert testimony is not required to prove serious mental injury, and proof may include a plaintiff's own testimony as well as other lay witnesses. *Miller v. Willbanks*, 8 S.W.3d 607, 615 (Tenn.

1999).  Physical manifestations of emotional distress and evidence that a plaintiff suffered

from nightmares, insomnia, and depression, or sought medical or psychiatric treatment may

support a claim for serious mental injury.  *Id.*

In this case, plaintiffs testified generally that they experienced stress, fear, and anxiety

as a result of Petersilie's campaign of intimidation and harassment.  The district court found

that Petersilie had "destroyed the plaintiffs' emotional tranquility and took away their use and

enjoyment of their lake property to such an extent that they felt terrorized by him."  As

defendants point out, however, plaintiffs did not testify to any physical manifestations of

emotional distress and did not seek medical treatment or counseling as a result of Petersilie's

conduct.  While no doubt upsetting and distressing, a loss of emotional tranquility will not

support a finding of serious mental injury.  *Id.* at 615 n.4 (more than transient trivial

emotional distress is required).[4]

Accordingly, we vacate the judgments entered in favor of plaintiffs on their claims of

outrageous conduct.

---

[4]Plaintiffs also argue that it was not necessary to prove serious mental injury, relying on the following quote from *Dunn v. Moto Photo, Inc.*, 828 S.W.2d 747, 749-50 (Tenn Ct. App. 1991):

> The law recognizes and protects the right to emotional tranquility, but where recovery is sought for mental or emotional disturbance alone, unconnected with any independently actionable tort or with contemporaneous or consequential objectively ascertainable injury, the conduct complained of must have been outrageous and serious mental injury must have resulted therefrom.

Although plaintiffs are correct that Tennessee law has allowed recovery for emotional injury as an element of compensatory damages for an independently actionable tort, proof of serious mental injury remains necessary to prevail on a "stand-alone" claim of intentional or even negligent infliction of emotional distress. *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 137 (Tenn. 2001) (citing cases).  In this case, the judgment makes clear that the plaintiffs were awarded compensatory damages on their "stand-alone" claims of intentional infliction of emotional distress.

## D.    Punitive Damages

Petersilie's challenge to the district court's award of punitive damages is threefold. He argues that his conduct did not justify the imposition of punitive damages, that the district court failed to properly consider the necessary factors in determining the amount of such damages, and that the amount of the award was so excessive as to be unconstitutional.

**(1)**  Punitive damages may be recovered in addition to compensatory damages, but may not be sustained absent an award of actual damages or injunctive relief. *Whittington v. Grand Valley Lakes, Inc.*, 547 S.W.2d 241, 243 (Tenn. 1977); *Oakley v. Simmons*, 799 S.W.2d 669, 672 (Tenn. Ct. App. 1990). While we have vacated the compensatory damage awards for outrageous conduct, we have affirmed the award of both injunctive relief and actual damages in tort for Petersilie's conduct. Consequently, the district court was entitled to consider plaintiffs' request for punitive damages.

To recover punitive damages, a plaintiff must prove, by clear and convincing evidence, that the defendant engaged in intentional, fraudulent, malicious, or reckless conduct. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). A person acts intentionally when "it is the person's conscious objective or desire to engage in the conduct or cause the result" and maliciously when he is "motivated by ill will, hatred, or personal spite." *Id.* Applying these standards, the district court specifically found

> by clear and convincing evidence that it was Petersilie's conscious objective or desire to engage in the conduct or cause the result of the interference with the easement holders' enjoyment and use of the easements in question, and that he acted intentionally and maliciously in posting signs, having their steps destroyed with a chain saw, moving their docks, and by his oral threats. Petersilie did so with the express purpose of obtaining a lease and rental income for [CFCE], and in turn, for himself as principal shareholder, in

exchange for plaintiffs' use of their easement. Therefore, the Court finds that plaintiffs are entitled to punitive damages from Petersilie individually based upon his intentional and malicious conduct.

Although Petersilie disingenuously testified that he did not know his net worth, he did brag to one of the plaintiffs that he had $5,000,000. In addition, he admitted on the stand that he had failed to include between $250,000 and $350,000 in cash on his financial statement. Although he failed to accurately assess his real property holdings, it was clear to the Court that they were extensive.

On appeal, defendants again argue that Petersilie genuinely believed the steps were constructed without authorization and that he had the right to have them removed. Defendants also reiterate Petersilie's claim that he acted out of concern for the safety of others and to secure liability insurance for the marina. The district court explicitly found that Petersilie's testimony was not credible and that no evidence was offered to corroborate his claim regarding liability insurance. Despite continued protestations that Petersilie was acting in good faith, the record amply supports the finding that he acted with intentional and malicious disregard for the plaintiffs' rights.[5]

**(2)** In determining the *amount* of punitive damages to award, Tennessee law requires the fact finder is to consider, to the extent relevant, at least the following factors:

(1) The defendant's financial affairs, financial condition, and net worth;

---

[5]The fact that no compensatory damages were assessed against Petersilie does not prevent the award of punitive damages against him for interfering with the plaintiffs' easement rights. Petersilie's actions were the basis for the damages award against CFCE, and just as an employer may be held vicariously liable for punitive damages based on an employee's actions within the scope of his employment, so may an employee be forced to bear the deterrent effect of punitive damages for his own actions even when the compensatory damages are assessed against his employer. *See Louisville & N. R. Co. v. Ray*, 46 S.W. 554, 555 (Tenn. 1898); *Huckeby v. Spangler*, 563 S.W.2d 555, 557-60 (Tenn. 1978) (punitive damages may be awarded against some but not all defendants); *Watson v. Dixon*, 532 S.E.2d 175, 177-78 (N.C. 2000) (punitive damages awarded against both employer and employee based on the same underlying conduct).

(2) The nature and reprehensibility of defendant's wrongdoing, for example
(A) The impact of defendant's conduct on the plaintiff, or
(B) The relationship of the defendant to plaintiff;

(3) the defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of punitive award.

*Hodges*, 833 S.W.2d at 901-02. In making this determination, the trier of fact is to keep in mind that the primary purpose of a punitive damage award is deterrence. *Id*. at 902.

While objecting to the amount as excessive, Petersilie has not attempted to show that the punitive damage awards were the result of passion, prejudice, improper sympathy, or were otherwise unjust. *See Coppinger Color Lab, Inc. v. Nixon*, 698 S.W.2d 72, 75 (Tenn. 1985). Nor have defendants attempted to show that consideration of the above factors would weigh against an award of punitive damages in this case.

Instead, Petersilie argues that it is not clear from the district court's written findings that any of the factors, except the first one relating to the defendant's financial situation, were

considered in determining the amount of punitive damages to award. Without actually saying so, Petersilie seems to argue that it was reversible error for the district court not to have explicitly addressed each of the factors in its opinion. It is true that the Tennessee Supreme Court requires that a trial court make explicit findings as to each of the relevant *Hodges* criteria even in a nonjury trial. *Culbreath v. First Tenn. Bank Nat'l Ass'n*, 44 S.W.3d 518, 528-29 (Tenn. 2001). This is, however, a procedural requirement to which the federal district court, sitting in diversity, is not bound to follow. *Medlin v. Clyde Sparks Wrecker Serv., Inc.*, No. 01-5941, 2003 WL 1194245, at *6 (6th Cir. Mar. 11, 2003) (citation omitted) (unpublished decision). The failure to make explicit findings is not grounds for reversal in this case.

**(3)** Finally, Petersilie argues that the punitive damage awards are so excessive as to violate due process under the principles outlined in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). In reviewing the constitutionality of a punitive damage award, the Court in *Gore* instructed courts to "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). Our review of the constitutionality of a punitive damage award is *de novo*. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 431 (2001).

With respect to the first guidepost, Petersilie argues that it was not "that reprehensible" for him to have the structures removed because he genuinely believed that

they were unauthorized encroachments, no one was physically injured, and the structures were removed when plaintiffs were not present. According to the Supreme Court, reprehensibility is determined based on consideration of whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419. The weighing of only one of these factors in favor of plaintiff may not be sufficient, and the absence of any factor weighing in favor of plaintiff "renders any award suspect." *Id*.

It is clear that the district court found Petersilie's actions were not taken in good faith, but were malicious and in reckless disregard of the plaintiffs' rights. The evidence further showed that the harm was not merely economic, but involved the destruction of property and intentional interference with the plaintiffs' use of the lake. Petersilie attempted to intimidate the plaintiffs into acquiescing, threatened them with arrest, and even caused the Browns to be detained for an hour on a charge of trespass. We find that several of the factors weigh in favor of the plaintiffs such that the degree of reprehensibility guidepost supports the award of punitive damages in this case.

The second guidepost focuses on the disparity between the actual harm or potential harm suffered by the plaintiff and the punitive damage award. The Supreme Court has declined to adopt concrete or bright-line constitutional limits for the ratio between actual or potential harm and a punitive damage award. *State Farm*, 538 U.S. at 425. The Court nonetheless observed that, "in practice, few awards exceeding a single-digit ratio between

punitive and compensatory damages, to a significant degree, will satisfy due process." *Id*. Noting that it had cited a 4-to-1 ratio as being close to the line of unconstitutional impropriety, the Court also emphasized that these ratios are instructive and demonstrate the principle that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1," or, as in *State Farm*, 145 to 1. *Id*. Particularly relevant to this case is the Court's further observation that the magnitude of the compensatory damage award may impact what may be a constitutionally permissible disparity. The Court explained that "because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Id* (citation omitted).

When the district court awarded $50,000 in punitive damages to each of the couples and to Winkler, that amount was not even double the compensatory damage awards, which ranged between $29,000 and $36,315. With this court's determination that plaintiffs did not establish the independent tort of outrageous conduct, the compensatory damage awards fall to between $5,000 and $11,315. These amounts clearly do not include any element of damages for mental anguish or distress and represent only the cost to replace the stairs and compensate the Huntingtons for interference with their easement rights. Even so, the ratios between the punitive damage awards and the remaining damage awards were as little as 5 to 1 and as much as 10 to 1. When the damages are aggregated, the ratio between the $200,000 in punitive damages and the $33,525 in compensatory damages is just less than 6 to 1. While

the ratios exceed the 4-to-1 ratio cited by the Supreme Court, all but one are single-digit ratios and the defendant's malicious conduct resulted in only a small amount of economic damages for injury to the plaintiffs' property or property interest.

As for the final *Gore* guidepost, Petersilie argues that there is a disparity between the punitive damage awards of $50,000 and the maximum fine of $10,000 that could be imposed upon a conviction for vandalism, a Class C felony under Tennessee law. TENN. CRIM. CODE §§ 39-14-408, 39-14-105, and 40-35-111(b)(3). While the existence of criminal penalties has bearing on the seriousness with which a state views the conduct, the Supreme Court noted in *State Farm* that a criminal penalty has "less utility" in determining the dollar amount of an award. 538 U.S. at 428. Defendants have not offered comparison to any civil penalties that might be authorized for similar conduct. Reviewing the punitive damages awarded in this case *de novo* and with reference to the *Gore* guideposts, we find the amount of punitive damages awarded in this case were not so grossly excessive as to violate due process.

We **REVERSE** the judgments in favor of plaintiffs on their claims of outrageous conduct and **AFFIRM** in all other respects.

**ROGERS, Circuit Judge, concurring and dissenting.**

I concur in all of the majority opinion except for Part II.D(2). Punitive damages were properly awarded, and the amounts do not violate due process. However, we are required to review the amount of punitive damages and "such an award will be set aside if it is grossly excessive or appears to be the result of passion, prejudice, improper sympathy, or for some other reason appears to constitute an injustice." *Coppinger Color Lab, Inc. v. Nixon*, 698 S.W.2d 72, 75 (Tenn. 1985). In order to determine whether the amount of punitive damages is excessive and constitutes an "injustice," federal courts sitting in diversity must apply the *Hodges* factors, to the extent relevant. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901-02 (Tenn. 1992). Even if we apply a deferential abuse-of-discretion scope of review to the district court's application of those factors, the record in this case does not, in my view, support an award of $200,000 in punitive damages. I would accordingly reverse the punitive damages award as well, and remand for further consideration in light of the substantive factors that Tennessee law requires a district court to consider in connection with the award of punitive damages.