IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 11, 2014 Session

**JAMES E. WHALEN ET AL. v. QUINT BOURGEOIS**

**Appeal from the Chancery Court for Morgan County**
**No. 12-59    Frank V. Williams, III, Chancellor**

---

**No. E2013-01703-COA-R3-CV-FILED-JUNE 27, 2014**

---

This action arose over the sale of improved real property ("the Property"), consisting of approximately twenty-five acres located in Morgan County, Tennessee. Co-plaintiffs, James E. and Karen M. Whalen, entered into an agreement to purchase the Property from the defendant, Quint Bourgeois. The Whalens subsequently entered into an agreement with co-plaintiffs, Alan and Kathleen Bone, to borrow the purchase price of the Property in return for an executed promissory note, secured by a deed of trust. The parties closed the purchase and sale of the Property on January 19, 2012, at the Roane County office of US Title of Tennessee, Inc. ("US Title"). On January 20, 2012, Mr. Bourgeois, upset that he had not received $900.00 in rent he believed the Whalens owed him, returned to the US Title office and convinced staff there to accept his uncashed check from the sale and give him the unrecorded deed. The plaintiffs filed this action against Mr. Bourgeois, ultimately amending their complaint to allege breach of contract, breach of the duty of good faith and fair dealing, and intentional interference with contractual relations.[1] Following a bench trial, the trial court found that Mr. Bourgeois had committed the tort of intentional interference with the contractual relationship between the Whalens and the Bones. The court further found that because the purchase and sales contract between the plaintiffs and Mr. Bourgeois had been completed at closing, Mr. Bourgeois did not breach that contract but did intentionally commit egregious acts by, *inter alia*, demanding the deed from the title company. The court awarded the Whalens $110,000.00 in compensatory damages, $14,736.99 in prejudgment interest, and $55,000.00 in punitive damages. The court awarded the Bones $76,733.50 in compensatory damages and $40,000.00 in punitive damages. The court also awarded the plaintiffs $1,324.81 in discretionary costs. The court vested title of the Property in Mr. Bourgeois, subject to the plaintiffs' judgment liens. Mr. Bourgeois appealed. We affirm the trial court's judgment as to the awards of compensatory damages and discretionary costs in favor of the

---

[1]The plaintiffs also named US Title as a defendant but subsequently reached a settlement before trial, and US Title is not a party to this appeal.

plaintiffs, prejudgment interest in favor of the Whalens, and vesting of title to the Property in Mr. Bourgeois, subject to the plaintiffs' judgment liens. We further affirm the trial court's judgment that Mr. Bourgeois is liable to the plaintiffs for punitive damages, but we vacate the amount of punitive damages awarded and remand for reassessment based upon the factors delineated in *Culbreath v. First Tenn. Bank Nat'l* Assoc., 44 S.W.3d 518 (Tenn. 2001) and *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992).

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Vacated in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and JOHN W. MCCLARTY, J., joined.

James S. Tipton, Jr., Knoxville, Tennessee, for the appellant, Quint Bourgeois.

Hoyt O. Samples, Chattanooga, Tennessee, for the appellees, James E. Whalen, Karen M. Whalen, Alan Bone, and Kathleen Bone.

**OPINION**

I. Factual and Procedural Background

Mr. Bourgeois, an experienced real estate investor and broker, purchased the Property, located at 1516 Airport Road in Oakdale, Morgan County, for $52,215.10 at a foreclosure sale in December 2011. A Substitute Trustee's Deed conveying the Property to Mr. Bourgeois was executed on December 19, 2011, and recorded on January 9, 2012. Prior to foreclosure, the Property had been the residence of John and Pamela Marshall, who were in the process of a divorce. Mr. Marshall had believed his wife was making monthly house payments and did not realize the home was in foreclosure until he discovered a note left on his front door by Mr. Bourgeois, informing the occupants of the completed sale.

The Whalens are Mr. Marshall's sister and brother-in-law. Upon being informed of the foreclosure, they contacted Shelly Marshall, Mr. Marshall's cousin by marriage and a real estate agent, and asked her to arrange a meeting with Mr. Bourgeois. The exact date of this initial meeting is not in the appellate record, but it is undisputed that it occurred soon after the foreclosure sale and in December 2011. Present at the meeting were, *inter alios*, Mr. Bourgeois, the Whalens, Mr. Marshall, and Shelly Marshall. During the meeting, the Whalens entered an oral agreement with Mr. Bourgeois to purchase the Property for the price of $75,000.00. The Whalens intended that Mr. Marshall and his children would continue to live in the home on the Property. The purchase and sales agreement was not memorialized

in writing. The Whalens subsequently obtained an agreement from Alan and Kathleen Bone to finance the purchase of the Property.

The parties closed the purchase and sale of the Property on the afternoon of January 19, 2012, with Jenny Ruiz of US Title acting as the closing agent. Among the documents executed by the parties were a Special Warranty Deed conveying title to the Property from Mr. Bourgeois to the Whalens and a Promissory Note reflecting the debt owed by the Whalens to the Bones in the amount of $76,733.50. The Whalens' debt to the Bones was secured by a Deed of Trust for principal in the amount of $76,733.50, plus interest, executed by the Whalens in favor of US Title as trustee. Mr. Bourgeois left the closing with a check for the full purchase price of $75,000.00 in hand. As the closing occurred late in the afternoon, the Special Warranty Deed and Deed of Trust remained at US Title's office and were not recorded that day.

The following morning, January 20, 2012, Mr. Bourgeois left Ms. Ruiz at US Title several telephone messages, stating that he wanted to return his check and retrieve the deed he had executed. Mr. Bourgeois subsequently appeared at the US Title office and convinced staff there to accept his uncashed check and deliver to him the unrecorded Special Warranty Deed. In demanding the deed, Mr. Bourgeois asserted that the Whalens had violated an oral agreement to pay him $900.00 in monthly rent if the closing occurred more than thirty days after the date that he had purchased the Property. The closing on January 19, 2012, took place thirty-one days after execution of the Substitute Trustee's Deed that conveyed the Property to Mr. Bourgeois.

At trial, the Whalens, Mr. Marshall, and Shelly Marshall all testified that the subject of rent had not been raised during their initial meeting with Mr. Bourgeois. They asserted that no rental agreement had been included in the oral purchase and sales agreement. US Title owner Stephanie Hatch testified that prior to closing, Mr. Bourgeois told US Title that a $900.00 rent charge should be added to the Whalens' settlement statement. It is undisputed, however, that in response to an email inquiry from Ms. Ruiz, Mr. Bourgeois directed US Title by email to remove the $900.00 charge. Mr. Bourgeois's email message, admitted into evidence, states in pertinent part: "Drop the charge. Not many good deeds go unpunished." Mr. Bourgeois testified that he withdrew his request for $900.00 because he had spoken by telephone with Ms. Whalen earlier that morning and accepted her request to pay the rent after closing because she and her husband did not have the money then. Ms. Whalen denied that she ever admitted owing the $900.00 or told Mr. Bourgeois she would pay it. Mr. Bourgeois acknowledged that he did not raise the issue of the $900.00 rent at the closing.

Mr. Bourgeois testified that he became upset when he learned at the closing that the Bones had been prepared to loan the Whalens additional funds and that the Whalens did not intend to pay him the $900.00 rent. He became more agitated when he reached Ms. Whalen by telephone at a restaurant the evening of the closing, demanded the $900.00, and had his call intercepted by Mr. Whalen, who told him not to call Ms. Whalen again. According to Mr. Bourgeois, he contacted an attorney at another title office on the morning of January 20, 2012, and upon the advice of the attorney, believed he could stop the purchase and sale of the Property by returning the uncashed check for sale proceeds to US Title in exchange for the deed that had yet to be recorded. When questioned at trial, Mr. Bourgeois gave only a first name for the attorney and offered no further proof of such a consultation. Mr. Bourgeois acknowledged that he believed taking back the deed would give him "leverage" to convince the Whalens to pay the $900.00 rent. He consistently asserted that obtaining the rent from the Whalens was a matter of principle.

On January 20, 2012, after Mr. Bourgeois had returned the check and obtained the deed, he telephoned Mr. Bone. At trial, Mr. Bone described the telephone conversation in relevant part as follows:

| Mr. Bone: | [H]e basically asked me, says, well, what do you think I should do, Alan? It floored me, but I says, Quint, what you need to do is take the deed back to U.S. Title, put it back, give it to them so they can get it filed; collect your check. If it's about the $900, I'll get it to you. |
|---|---|
| Plaintiffs' Counsel: | And how did he respond to that? |
| Mr. Bone: | After I offered him the $900, he screamed at me or basically hollered, it's not about the $900. I just – I have no idea. He had plenty of opportunities to accept this $900. |
| Plaintiffs' Counsel: | So you tried to get him to take $900, take the deed back so none of this would happen? |
| Mr. Bone: | Yes. I did offer it to him, yes. |
| Plaintiffs' Counsel: | And he hollered what at you? |
| Mr. Bone: | It's not about the $900. |

-4-

| | |
|---|---|
| Plaintiffs' Counsel: | What did you tell him you were going to have to do then? |
| Mr. Bone: | That's when I told him, I said, I'm gonna have to go to an attorney. I said, I can't live with what's going on here. Gotta get this deed back. |
| Plaintiffs' Counsel: | And what did he say? |
| Mr. Bone: | He said, you go ahead and get an attorney, whatever. He says, you can do whatever you want to do. But he says, you'll probably win, but I'll drag it out as long as I can. |

When questioned regarding why US Title accepted the check from Mr. Bourgeois and returned the Special Warranty Deed to him, Ms. Hatch stated that she and her staff were intimidated when Mr. Bourgeois came to their office demanding the deed and appearing "upset and agitated." She feared Mr. Bourgeois, a locally prominent real estate agent, would become angry at US Title and would spread negative rumors about her business in the community. According to Ms. Hatch, Mr. Bourgeois informed her that he had spoken to a lawyer and that "the lawyer said if he refused the check, that I had to give him back the deed." She offered to waive the $600 to $700 fee charged by US Title if Mr. Bourgeois would accept the purchase check, but Mr. Bourgeois declined the offer, stating that it was not Ms. Hatch's responsibility to pay the rental fee. Ms. Hatch was not able to reach her own attorney until after Mr. Bourgeois left US Title with the deed. Upon her own attorney's subsequent advice that Mr. Bourgeois had not been entitled to the deed, Ms. Hatch attempted to telephone Mr. Bourgeois and request that he return the instrument of conveyance. He did not answer the call, but US Title personnel left him a message. Mr. Bourgeois did not respond.

The $75,000.00 check returned to US Title by Mr. Bourgeois had been written and delivered to him by US Title at the closing upon the title company's receipt of a cashier's check from the Bones in the amount of $76,733.50. Upon return of the check, US Title held the entire $76,733.50 in trust until August 6, 2012, when upon motion from the Bones, the trial court entered an agreed order to deposit the funds with the clerk and master of the Morgan County Chancery Court, pursuant to Tennessee Rule of Civil Procedure 67.

Through the date of trial, Mr. Marshall and his children continued to reside on the Property, paying monthly rent in the amount of $366.34 to the Whalens. The Whalens in turn

paid $366.34 monthly to the Bones pursuant to the terms of the Promissory Note, despite having no recorded title to the Property.

On January 27, 2012, the plaintiffs filed a complaint against Mr. Bourgeois and US Title in the Roane County Circuit Court. The complaint alleged against Mr. Bourgeois and on behalf of the Whalens: (1) breach of the contract between Mr. Bourgeois and the Whalens (2) intentional interference with the contractual relationship between the Whalens and the Bones, and (3) negligence. The complaint also alleged procurement of breach of contract on behalf of the Bones. The plaintiffs requested specific performance of the purchase and sales contract, as well as damages for negligence and intentional interference with contractual relations, the latter to be trebled pursuant to Tennessee Code Annotated § 47-50-109 (2013), and punitive damages. In addition, the plaintiffs requested a restraining order enjoining Mr. Bourgeois from transferring title to the Property. On January 27, 2012, the Roane County Circuit Court entered a temporary restraining order, restraining Mr. Bourgeois from "selling, disposing, transferring, or encumbering" the Property pending further proceedings. On February 6, 2012, the Roane County court entered an agreed order, amending the temporary restraining order to constitute an "agreed injunction" pending further orders of the court.

Mr. Bourgeois filed a motion to dismiss on March 2, 2012, asserting, *inter alia*, that the action was improperly filed in the Roane County Circuit Court because a suit to compel specific performance of a property sales contract lies only in the county where the subject deed is registered, or Morgan County in this instance. *See* Tenn. Code Ann. § 16-11-114(1) (2009) ("All bills filed in any court seeking to divest or clear the title to land, or to enforce the specific execution of contracts relating to realty . . . shall be filed in the county in which the land, or a material portion of it, lies, or in which the deed or mortgage is registered; . . ."). The plaintiffs filed a timely response to the motion to dismiss. They subsequently requested voluntary non-suit of their specific performance "claim" only, and the Roane County Circuit Court entered an order dismissing the plaintiffs' request for specific performance without prejudice on April 17, 2012. The plaintiffs subsequently filed an amended complaint in the Roane County Circuit Court on April 25, 2012, alleging the same causes of action as in the original complaint and requesting return of the Special Warranty Deed and damages.

On May 8, 2012, the Whalens, acting without the Bones, filed a complaint against Mr. Bourgeois in the Morgan County Chancery Court, alleging breach of contract and breach of the duty of good faith and fair dealing. Basing their complaint on the same allegations as in the Roane County action, the Whalens reinstated their request for specific performance of the purchase and sales contract and again requested damages. On May 21, 2012, the Roane County Circuit Court entered an agreed order, transferring the cause to the Morgan County Chancery Court and consolidating the Roane County and Morgan County cases. Mr.

Bourgeois again filed a motion to dismiss the action on June 20, 2012. The plaintiffs responded to Mr. Bourgeois's motion on June 22, 2012, and concomitantly moved for default judgment and requested that the court order Mr. Bourgeois to deposit the Special Warranty Deed with the clerk and master for safekeeping. Mr. Bourgeois subsequently filed an answer to the motion for default judgment, incorporating his previously filed motion to dismiss.

On October 5, 2012, the Whalens and the Bones filed an amended complaint against Mr. Bourgeois and US Title in the consolidated action, again alleging against Mr. Bourgeois breach of his contract with the Whalens, breach of the duty of good faith and fair dealing, and intentional interference with contractual relations as to both the Whalens and the Bones. The plaintiffs again requested specific performance of the purchase and sales contract, damages, and an injunction restraining Mr. Bourgeois from transferring the Property. Mr. Bourgeois filed an answer to the amended complaint on November 26, 2012, asserting the affirmative defenses of estoppel, failure of consideration, laches, unclean hands, waiver, and non-performance of a condition precedent.

Meanwhile, on October 24, 2012, US Title filed a cross-claim against Mr. Bourgeois, alleging that he had committed conversion when he appropriated the deed and that his actions constituted procurement of a breach of settlement agreement. US Title subsequently amended its cross-claim on March 8, 2013, maintaining essentially the same allegations. Mr. Bourgeois answered the amended cross-claim in May 2013 and asserted defenses identical to those stated in his answer to the plaintiffs' complaint.

In a related action, Mr. Bourgeois filed a third-party complaint against John and Pamela Marshall on December 13, 2012. Mr. Bourgeois requested that the trial court order the Marshalls to relinquish possession of the Property and pay past-due rent and additional damages. On January 18, 2013, Mr. Marshall filed an answer to the third-party complaint, denying the allegations and noting that the Marshalls were by then divorced and that Pamela Marshall did not reside on the property. Mr. Marshall subsequently filed a motion to impose sanctions and recover expenses and attorney's fees against Mr. Bourgeois on March 21, 2013. At the close of trial, the third-party claims brought against and on behalf of Mr. Marshall were dismissed in their entirety and are not at issue in this appeal.

The trial court conducted a trial on May 24, 2013. Preliminarily, the court denied the plaintiffs' motion for default judgment and reserved ruling on Mr. Bourgeois's motion for payment of rent. In addition, the parties announced a settlement with US Title, and on May 24, 2013, the trial court entered separate orders dismissing the plaintiffs' claim against US Title and US Title's cross-claim against Mr. Bourgeois, respectively.

At the close of trial, the court found, *inter alia*, that Mr. Bourgeois had committed the tort of intentional interference with contractual relations between the Whalens and the Bones "on a number of levels." The trial court awarded a judgment in favor of the Whalens in the amount of $110,000.00 in compensatory damages, $14,736.99 in prejudgment interest, and $55,000.00 in punitive damages. The court awarded a judgment in favor of the Bones in the amount of $76,733.50 in compensatory damages, $4,112.07 in prejudgment interest, and $40,000.00 in punitive damages. The court vested title to the Property in Mr. Bourgeois, subject to the plaintiffs' judgment liens. Upon request of the plaintiffs, the trial court directed that the funds held by the clerk and master, equaling $77,010.91 on the day of trial, be disbursed immediately to the Bones.

Having held the issue of discretionary costs in abeyance, the trial court subsequently heard the plaintiffs' motion for discretionary costs on June 20, 2013, and also heard oral argument as to the content of the final judgment. The court entered the final judgment that day, incorporating all awards of damages listed above except the prejudgment interest previously awarded to the Bones in the amount of $4,112.07. Also on June 20, 2013, the trial court entered an order awarding the plaintiffs discretionary costs in the amount of $1,324.81. Mr. Bourgeois timely appealed.

## II. Issues Presented

Mr. Bourgeois has presented seven issues on appeal, which we restate as follows:

1.  Whether the trial court erred by awarding the Whalens a judgment against Mr. Bourgeois in the amount of $110,000.00 in compensatory damages, representing the difference in the purchase price of the Property and its fair market value as of the date of closing, in view of the trial court's ruling that the purchase and sales contract was completed.

2.  Whether the trial court erred by awarding the Whalens a judgment against Mr. Bourgeois for prejudgment interest in the amount of $14,736.99 based on the award of compensatory damages.

3.  Whether the trial court erred by awarding the Bones a judgment against Mr. Bourgeois in the amount of $76,733.50 for compensatory damages.

4.  Whether the trial court erred by awarding the Whalens punitive damages in the amount of $55,000.00.

5.  Whether the trial court erred by awarding the Bones punitive damages in the amount of $40,000.00.

6.  Whether the trial court erred by awarding the Whalens and Bones discretionary costs in the amount of $1,324.81.

7.  Whether the trial court erred by divesting title to the real Property out of the Whalens and vesting it into Mr. Bourgeois.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Hughes v. Metro. Gov't of Nashville & Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). While "the amount of damages to be awarded in a particular case is essentially a fact question," "the choice of the proper measure of damages is a question of law." *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Conversion

We first address a threshold issue of whether the trial court entered a judgment for the Whalens based on the tort of conversion of the Special Warranty Deed, and if so, whether such a judgment was in error. In his principal brief on appeal, Mr. Bourgeois raises issues regarding the amount and measure of damages awarded the plaintiffs, as opposed to the possible remedy of returning the Special Warranty Deed to the Whalens and so quieting title to the Property on behalf of the Whalens. In addition to responding to these remedy issues, the plaintiffs in their responsive brief assert that the trial court properly found Mr. Bourgeois liable to the Whalens for the tort of conversion, which they maintain had been tried by implied consent, pursuant to Tennessee Rule of Civil Procedure 15.02. The plaintiffs concede that they did not allege conversion in their pleadings but argue that they did allege the facts upon which the court found conversion. Mr. Bourgeois in his reply brief,

responding to the plaintiffs' conversion argument, contends that the plaintiffs cannot rely on the trial court's finding of conversion to justify the damages award to the Whalens because conversion was not pled by the Whalens and was not tried by implied consent. Upon a careful and thorough review of the record, we determine that although the trial court referred to conversion in its ruling from the bench, its judgment in favor of the Whalens was based upon its finding that Mr. Bourgeois had committed the common law tort of intentional interference with contractual relations.

As the plaintiffs correctly note, Tennessee Rule of Civil Procedure 15.02 creates an exception to the general rule that "[j]udgments awarded beyond the scope of the pleadings are void." *See Randolph v. Meduri*, 416 S.W.3d 378, 384 (Tenn. Ct. App. 2011). Rule 15.02 provides in pertinent part:

> **15.02. Amendments to Conform to the Evidence.** – When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

 "'Generally speaking, trial by implied consent will be found where the party opposed to the amendment knew or should reasonably have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby.'" *Hiller v. Hailey*, 915 S.W.2d 800, 804 (Tenn. Ct. App. 1995) (quoting *Zack Cheek Builders v. McLeod*, 597 S.W.2d 888, 890-91 (Tenn. 1980)). As this Court has explained, however, "'[t]rial by implied consent is not shown by the presentation of evidence that is relevant to an unestablished issue when that evidence is also relevant to the established issue.'" *Christmas Lumber Co., Inc. v. Valiga*, 99 S.W.3d 585, 593 (Tenn. Ct. App. 2002) (quoting *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997)).

In the case at bar, the written judgment entered by the trial court details the specific damages awarded to the plaintiffs but does not specify the cause of action upon which the damages are based. The trial court explained its findings of fact and conclusions of law in its ruling at the close of trial, the transcript of which is included in the record. In pertinent part, the trial court stated:

> And with regard to the closing statements as to how to characterize this lawsuit, I agree with what Mr. Williams [Mr. Marshall's counsel] said over

there. This isn't breach of contract. This is a theft of documents of a done deal.

When Mr. Bourgeois signed that deed and handed it to the closing agent and when the note was signed by the Whalens and given to Mr. Bone, and when the Whalens signed the deed of trust securing the note that they had just given to Mr. Bone, title passed then at that moment. The title passed by law. By statute the title passed. The Whalens then owned the beneficial interest in the land.

The trustee in the deed of trust, and I don't know who it was, owned the legal title and the land for the benefit of Mr. Bone, who was financing the deal and who had the right under the note to receive the payments that had been agreed upon by the parties.

So the transaction was completed. It was concluded. Title had passed. You don't go down there – Mr. Bourgeois said he got advice from counsel before he did this. Well, you know, I'd have to have that lawyer come take the witness stand and confess to that before I would believe Mr. Bourgeois, that any lawyer would advise him that he could do that.

I just don't believe it. He's not credible. That's not a credible statement. No lawyer in his right mind would ever tell him to do that. That's crazy. To make that argument is just so absurd.

I have been at this almost 29 years, and I believe this is the most outlandish case. In a way it's such a small case, I mean, when you're talking about $900. The small amount of money that is involved here is just indicative of the outrageous nature of what Mr. Bourgeois did by going down there and intimidating the closing agent into giving him the deed back.

It makes it all the more worse for him that it was done for the sake of $900, which is disputed. If I had to say who I believe right at this point, I would have to say that I don't believe Mr. Bourgeois; that I would believe those who said there was no discussion about agreeing to pay rent after 30 days. If I had to pick somebody to believe, it would be them, not Mr. Bourgeois. In 29 years I can't recall anything like this. I just don't recall it.

So when Mr. Williams calls this a theft, a tort, a conversion, well, yeah, that's [the] way I look at it. I think he's right about it. I think counsel is right.

-11-

If there are other ways to make people whole, then specific performance is not the way to go.

I think Mr. Bourgeois committed a [tort], an intentional interference with contractual relations between these other parties on a number of levels. I'm going to find that he did this knowingly, intentionally; that he did it for the purpose – as Mr. Williams pointed it out quite clearly, he said by getting the deed back he was going to use that as leverage to get the $900.

That's just outrageous conduct. It may not be the foundation for a lawsuit based upon the [tort] of outrageous conduct, but insofar as the tortious interference with the contractual relations between these other parties, in my way of thinking it is outrageous conduct, especially when you consider that the lady who did the closing said, let's not do this, I'll give up my fees, we'll forfeit our fees; which were then 6- or $700 before he ever got hold of the documents.

In mentioning conversion, the trial court appeared to be emphasizing that the purchase and sale of the Property was complete with execution and delivery of the deed. *See Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 466 (Tenn. 2012) ("'In Tennessee, as in other states, land conveyances generally occur in a two step process: execution of a land sale contract followed by execution and delivery of a deed.'") (quoting with approval *In re Gee*, 166 B.R. 314, 317 (Bankr. M.D. Tenn. 1993)). The trial court thus found that Mr. Bourgeois's appropriation of the subject deed was a "theft" of the document. *See Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965) ("A conversion, in the sense of the law of trover, is the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right."). In so doing, the court agreed with the characterization of Mr. Bourgeois's actions that had been presented immediately prior to the court's ruling by counsel for the third-party defendant, Mr. Marshall. The trial court, however, continued by emphatically stating that Mr. Bourgeois had "committed a [tort]" and that the tort was "intentional interference with contractual relations between these other parties on a number of levels." The court further found that Mr. Bourgeois had committed this interference "knowingly and intentionally" for the purpose of obtaining the $900.00 he claimed the Whalens owed him for rent.

Having interpreted the trial court's comments within the full context of the proceedings, we conclude that the court's judgment in favor of the Whalens was not based on a finding of conversion. Instead, the court's judgment in favor of both the Whalens and the Bones was based on its finding that Mr. Bourgeois committed the tort of intentional interference with contractual relations. We note that Mr. Bourgeois concedes the essential

facts supporting a finding that he appropriated the deed conveying property to the Whalens following a completed real estate transaction. We need not pursue further analysis of whether conversion was tried by implied consent in the action brought by the Whalens because the trial court's ruling clearly indicates that its judgment was actually based on the tort of intentional interference with contractual relations.

## V. Intentional Interference with Contractual Relations

Mr. Bourgeois contends that the trial court erred by awarding the Bones compensatory and punitive damages based on its finding that he interfered with their contractual relationship with the Whalens. The plaintiffs contend that the trial court properly awarded damages to the Bones based upon Mr. Bourgeois's interference because all required elements of both statutory and common law interference with contractual relations, or inducement to breach a contract, were proven. We conclude that the weight of the evidence preponderates in favor of the trial court's finding that Mr. Bourgeois tortiously interfered with the plaintiffs' contractual relations "on many levels." Moreover, as explained in the previous section of this opinion and based upon our thorough review of the record, we conclude that the trial court properly found Mr. Bourgeois liable to all plaintiffs, the Whalens and the Bones, for compensatory and punitive damages based upon the tort of intentional interference with contractual relations.

The plaintiffs alleged both a common law claim for intentional interference with contractual relations and a statutory claim for inducement of breach of contract, pursuant to Tennessee Code Annotated § 47-50-109, which provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

As to the interplay between the common law and statutory actions, our Supreme Court has explained:

> Tennessee recognizes both a statutory and common law action for inducement to breach a contract, *see* Tenn. Code Ann. § 47-50-109 (2001); *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 543 (Tenn. 1989), and both forms of the action are identical, except that a plaintiff

-13-

asserting a common law action may recover punitive damages, instead of the treble damages mandated by the statute. *See Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 360-61 (Tenn. Ct. App. 1999). In order to recover on a theory of inducement to breach a contract, a plaintiff must allege and prove seven elements: (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured the plaintiff. *See Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994); *Baker v. Hooper*, 50 S.W.3d 463, 468 (Tenn. Ct. App. 2001).

*Givens v. Mullikin*, 75 S.W.3d 383, 405 (Tenn. 2002). The basic principle in awarding compensatory damages to a plaintiff who has proven inducement to breach a contract is that the damages "must be based on the direct and proximate result of the wrongful acts of the person procuring the breach of contract." *See Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distrib. Co.*, 734 S.W.2d 322, 324 (Tenn. 1987) (noting the identical elements of the common law claim and the statutory claim for inducement to breach a contract under Tenn. Code Ann. § 47-50-109).

In the instant action, the trial court awarded punitive damages to both the Whalens and the Bones and expressly did not award treble damages, indicating that the judgment entered was in accordance with the common law tort of inducement to breach a contract, rather than the statutory action. As for the elements of the common law action, it is undisputed that the Promissory Note constituted a legal contract between the Whalens and the Bones and that Mr. Bourgeois not only was aware of the Promissory Note but was present at the closing when it was executed. Moreover, it is clear from the record that the Bones loaned the Whalens $76,733.50 with the understanding that this loan would facilitate the Whalens' purchase of the Property. The Bones required as security for the loan that the Whalens execute a Promissory Note and a Deed of Trust. Thus, the contract between the Whalens and the Bones included not only the Promissory Note but also the Deed of Trust executed by the Whalens in favor of US Title. *See Ferguson v. Peoples Nat'l Bank of LaFollette*, 800 S.W.2d 181, 183 (Tenn. 1990) (noting with approval the "widely accepted general rule that a mortgage or deed of trust and a note or bond secured by it are to be deemed parts of one transaction and construed together as such . . . .") (quoting 55 Am. Jur. 2d *Mortgages* § 176 at 303-04 (1971)).

Mr. Bourgeois does not dispute the trial court's finding that he acted "knowingly and intentionally" when he convinced US Title to accept his uncashed check in return for the executed Special Warranty Deed. Mr. Bourgeois's primary arguments in support of his

contention that the trial court erred in awarding compensatory damages are that (1) no contract was breached, (2) the court did not find that Mr. Bourgeois acted with malice, and (3) neither the Whalens nor the Bones were injured by any effect of Mr. Bourgeois's actions on the Promissory Note. We disagree.

First, Mr. Bourgeois asserts that the plaintiffs did not demonstrate a breach of contract because the Whalens had made payments to the Bones on the Promissory Note as agreed. At trial, Mr. Bone testified that since the closing, he and his wife had received from the Whalens $366.34 in monthly payments toward the Promissory Note. The Whalens and Mr. Marshall testified that these payments had been made first by Mr. Marshall as monthly rent to the Whalens, who then forwarded the payments to the Bones in honor of the Promissory Note. Mr. Bourgeois's assertion ignores, however, that once he had appropriated the Special Warranty Deed, the Whalens could no longer convey title to the Property to the trustee named in the Deed of Trust, US Title. The Whalens were unable to provide a valid, enforceable Deed of Trust, which they were required to provide the Bones in exchange for the Bones' loaning the purchase price of the Property. Despite the Whalens' willingness to continue making monthly payments to the Bones pursuant to the Promissory Note, at least through the date of trial, the Whalens were in breach of their overall contract with the Bones. This breach was unquestionably the proximate result of Mr. Bourgeois's interference. The Whalens, of course, were also without the benefit of their bargain, namely recorded title to the Property as signified by the Special Warranty Deed and secured by the Deed of Trust. *See Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 491 (Tenn. 2009) (noting the benefit of the bargain as "traditionally the core concern of contract law") (quoting *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 870 (1986)).

Second, Mr. Bourgeois maintains that because the trial court did not find his actions to be "malicious," the court erred by holding him liable for intentional interference with the plaintiffs' contract. In its judgment, the trial court awarded punitive damages "as a result of [Mr. Bourgeois's] intentional and egregious acts." In reviewing the language of the judgment draft submitted by the plaintiffs during the post-judgment hearing, which included the words, "intentional, malicious, and egregious," the trial court explained:

Well, I think somewhere I would take out the – it was intentional, malicious, and egregious. I would take out the words malicious – I would take out the malicious. But I do think that in order to support an award of punitive damages, that it has to be something more than just a run of the mill tort case.

And as I indicated at the trial of the lawsuit, at the conclusion of the case, I didn't consider this to be just an ordinary breach of contract lawsuit. I thought that this was a completed real estate transaction, that the deeds had

-15-

been all executed, exchanged, were in the possession of a third party, that being the closing agent, and that title, even though the deeds had not been recorded because it was late in the evening of the previous day when the closing was conducted, that title had passed, and that when Mr. Bourgeois went down and intimidated the closing agent to give him the warranty [deed] back, that that was a tort rather than a breach of contract. And not just a tort, but an intentional tort and one that would support an award of punitive damages.

One thing I did, of course, there was a claim for treble damages, I didn't do that, but I thought that punitive damages were justifiable and that I think it's appropriate in an order to indicate that the punitive damages are based upon what I consider to be an intentional and egregious act on the part of Mr. Bourgeois.

To support his argument, Mr. Bourgeois cites the definition of "malicious" set out as one of the four alternative mental states a court is required to find in order to award punitive damages: "A person acts maliciously when the person is motivated by ill will, hatred, or personal spite." *Hodges*, 833 S.W.2d at 901 (holding that punitive damages may be awarded only if a court finds that the defendant "acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly"). This Court previously has held, however, that within the context of an action for procurement of breach of contract,[2] the required element of "malice is 'the wilful violation of a known right.'" *Prime Co. v. Wilkinson & Snowden, Inc.*, No. W2003-00696-COA-R3-CV, 2004 WL 2218574 at *4 (Tenn. Ct. App. Sept. 30, 2004) (quoting *Crye-Leike Realtors, Inc. v. WDM, Inc.*, No. 02A01-9711-CH-00287, 1998 WL 651623 at *6 (Tenn. Ct. App. Sept. 24, 1998) (in turn quoting *Dorsett Carpet Mills*, 1986 WL 622 at *6)). "[T]he 'ill will' definition of malice for punitive damages doe[s] not apply to procurement of breach . . . ." *Prime Co.*, 2004 WL 2218574 at *4. As this Court has explained:

It was sufficient if the evidence showed that [the defendant's] conduct was intentional and without legal justification. . . . Interference is without justification if it "is done for the indirect purpose of injuring the plaintiff or benefiting the defendant at the plaintiff's expense."

_____

[2]We note that the common law action of "intentional interference with contractual relations" is alternatively referred to as "procurement of breach of contract," as well as the statutory action's title of "inducement to breach a contract." *See, e.g., Jones v. LeMoyne-Owen College*, 308 S.W.3d 894, 908 (Tenn. Ct. App. 2009).

-16-

*Id.* (quoting *Crye-Leike Realtors*, 1998 WL 651623 at *6) (in turn quoting *Bismarck Realty Co. v. Folden*, 354 N.W.2d 636, 642 (N.D. 1984)).

In the judgment at issue, the trial court struck the word "malicious" from the paragraphs awarding punitive damages, indicating that it was employing the definition of "malicious" used within the context of punitive damages. *See Hodges*, 833 S.W.2d at 901. As to the definition of malice required for procurement of breach of contract, the court expressly found that Mr. Bourgeois acted intentionally and certainly without legal justification to demand return of the Special Warranty Deed. *See Prime* Co., 2004 WL 2218574 at *4. In its ruling following trial, the court also found that Mr. Bourgeois acted "knowingly" and with the purpose of using the deed as "leverage to get the $900." Such a purpose for "leverage" exemplifies the phrase, "benefitting the defendant at the plaintiff's expense." *See id.* (quoting *Crye-Leike*, 1998 WL 651623 at *6). In addition, the trial court purposefully did not strike the word "egregious" and utilized it to describe Mr. Bourgeois's actions. In simple terms, "egregious" is defined as conduct "extremely or remarkably bad; flagrant." *See* BLACK'S LAW DICTIONARY 555 (8th ed. 2004). We determine that the trial court, although it did not employ the word "malice" as used within the context of intentional interference with contractual relations, properly found the requisite culpability on Mr. Bourgeois's part to support the common law tort.

Finally, Mr. Bourgeois argues that the plaintiffs failed to demonstrate injury suffered as a result of his interference with the contractual relationship between the Whalens and the Bones. This argument follows from Mr. Bourgeois's contention that the Promissory Note was not breached. The argument is unavailing. Due to Mr. Bourgeois's intentional interference, the Bones were left without the security of a valid and recorded Deed of Trust, which they had required of the Whalens in return for providing the funds to purchase the Property, and the Whalens for their part were left without the title to the Property for which they had become indebted to the Bones. We conclude that the evidence supports the trial court's finding that Mr. Bourgeois committed the common law tort of intentional interference with the contractual relationship between the Whalens and the Bones.

VI. Damages

A. Compensatory Damages

1. The Whalens

Mr. Bourgeois contends that the trial court erred by basing its award of compensatory damages to the Whalens in the amount of $110,000.00 upon the difference between the purchase price and fair market value of the Property. His argument is grounded in his

assertion that the trial court found no breach of the purchase and sales contract, as he concedes that the proper measure of damages for such a breach would be the difference between the purchase price and market value at the time of sale. *See Security Land Co. v. Touliatos*, 716 S.W.2d 918, 921 (Tenn. 1986). Mr. Bourgeois's argument fails to take into account the overall agreement between the Whalens and Bones, memorialized by both the Promissory Note and the Deed of Trust, with which Mr. Bourgeois interfered. We determine that as a direct result of Mr. Bourgeois's wrongful acts, the Whalens lost the difference between the purchase price and market value of the Property at the time of closing, or what would have been the benefit of their indebtedness to the Bones for the purchase price, secured by the Deed of Trust in favor of US Title as trustee.

As previously noted, compensatory damages awarded to a plaintiff who has proven inducement to breach a contract "must be based on the direct and proximate result of the wrongful acts of the person procuring the breach of contract." *See Dorsett Carpet Mills*, 734 S.W.2d at 324. In this case, the trial court arrived at $110,000.00 as the difference between the purchase price and fair market value of the Property after hearing testimony from Chris Jackson, a state-certified residential real estate appraiser called by the plaintiffs. Mr. Jackson appraised the Property at a market value of $185,000.00 and explained that it was assessed for tax purposes at $190,900.00. In addition, Mr. Bourgeois, explaining that he initially meant to help Mr. Marshall remain on the Property, acknowledged that he sold the Property for less than its fair market value, which he testified was in excess of $150,000.00.

Before trial began, Mr. Bourgeois objected to the trial court's admission of expert testimony from Mr. Jackson based upon short notice of the testimony. The trial court admonished the plaintiffs for providing only a few days' notice of the expert testimony, but the court further noted that Mr. Bourgeois and his counsel had known that Mr. Jackson completed an appraisal of the property well in advance of trial. The court overruled Mr. Bourgeois's objection to Mr. Jackson's testimony, and Mr. Bourgeois offered no opposing proof to demonstrate that the appraisal was inaccurate. *See Wilson v. Monroe County*, 411 S.W.3d 431, 441 (Tenn. Ct. App. 2013) ("The admission of expert testimony is entrusted to the sound discretion of the trial court.") (citing *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 255 (Tenn. 1997)). In awarding a judgment for compensatory damages in the amount of $110,000.00 to the Whalens, the trial court accepted Mr. Jackson's appraisal of the Property's market value in the amount of $185,000.00 and subtracted the $75,000.00 purchase price. We conclude that this value was reasonable based upon the evidence submitted and that the trial court did not err by awarding the Whalens $110,000.00 in compensatory damages.

## 2. The Bones

Mr. Bourgeois also contends that the trial court erred by awarding the Bones $76,733.50 in compensatory damages. His assertion is grounded in his argument that the Promissory Note was not breached. This assertion is unavailing in light of our conclusion that Mr. Bourgeois's interference forced a breach of the overall agreement between the Whalens and the Bones, stripping both couples of the loan security that otherwise would have been provided by the Whalens' execution of the Deed of Trust. By awarding the Bones $76,733.50 in compensatory damages, the trial court returned the exact amount to the Bones that they had loaned to the Whalens to facilitate purchase of the Property. Insofar as these funds had been inaccessible to the Bones, kept first in trust at US Title and subsequently deposited with the clerk and master, return of the funds represented compensation for a direct loss due to Mr. Bourgeois's wrongful actions. *See Hodges*, 833 S.W.2d at 902 (noting that "the purpose of compensatory damages is to make the plaintiff whole").

We conclude that the trial court did not err by awarding the Bones compensatory damages in the amount of $76,733.50. The trial court also did not err by ordering that the funds deposited with the trial court clerk and master be disbursed immediately to the Bones to fulfill this award of compensatory damages. These funds included the $76,733.50 originally deposited plus $277.41 earned in interest. We note that the award of compensatory damages has been paid to the Bones prior to this appeal and that any other damages due to the Bones should be offset by the amount of $277.41.

### B. Prejudgment Interest to the Whalens

The trial court awarded the Whalens prejudgment interest in the amount of $14,736.99, pursuant to Tennessee Code Annotated § 47-14-123 (2013).[3] Mr. Bourgeois's sole assignment of error regarding this award is that it flowed from what he believed to be an erroneous award of compensatory damages. Having concluded that the trial court did not error in awarding the Whalens a judgment in the amount of $110,000.00 for compensatory damages, we further conclude that the trial court did not abuse its discretion by awarding the Whalens $14,736.99 in prejudgment interest. *See Reeder v. Reeder*, 375 S.W.3d 268, 281

---

[3]Tennessee Code Annotated § 47-14-123 provides in pertinent part:

Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum; . . .

(Tenn. Ct. App. 2012) ("[I]n most civil actions whether to award prejudgment interest lies within the sound discretion of the trial court . . . .").[4]

## C. Punitive Damages

Mr. Bourgeois contends that the trial court erred by awarding the Whalens $55,000.00 and the Bones $40,000.00 in punitive damages because (1) the plaintiffs failed to present clear and convincing evidence of conduct warranting punitive damages and (2) the trial court failed to consider all applicable factors to be used in determining the amount of punitive damages. The plaintiffs contend that the trial court properly awarded punitive damages because the court expressly found Mr. Bourgeois's actions to be intentional, egregious, and outrageous. We conclude that the trial court did not err in finding clear and convincing evidence that Mr. Bourgeois is liable to the plaintiffs for punitive damages. We also must conclude, however, that the trial court erred by failing to assess the amount of punitive damages based upon the factors delineated in *Culbreath*, 44 S.W.3d at 528 and *Hodges*, 833 S.W.2d at 901-02, and we remand for reassessment of the amount of punitive damages in consideration of these factors.

Regarding Mr. Bourgeois's liability for punitive damages, a court may award punitive damages "only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges*, 833 S.W.2d at 901. As our Supreme Court explained in *Hodges:*

> A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. *Cf.* T.C.A. § 39-11-302(a) (1991) (criminal definition of "intentional"). A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. *See First Nat'l Bank v. Brooks Farms*, 821 S.W.2d 925, 927

---

[4]We note that in the trial court's ruling immediately following trial, it articulated an award of prejudgment interest to the Bones in the amount of $4,112.07. This award was not included, however, in the written judgment. *See Heath v. Memphis Radiological Prof'l Corp.*, 79 S.W.3d 550, 556 (Tenn. Ct. App. 2001) ("[A] court speaks through its written orders."). Insomuch as the absence of an award of prejudgment interest to the Bones in the final judgment has not been raised as an issue by the Bones on appeal and was not raised in the trial court, we find no reason to disturb the trial court's judgment in this regard. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error."). The Bones, therefore, are not entitled to an award of prejudgment interest.

(Tenn. 1991). A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. *Cf.* T.C.A. § 39-11-302(c) (1991) (criminal definition of "reckless").

Further, because punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence.[FN] This higher standard of proof is appropriate given the twin purposes of punishment and deterrence: fairness requires that a defendant's wrong be clearly established before punishment, as such, is imposed; awarding punitive damages only in clearly appropriate cases better effects deterrence.

[FN.] Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*Id.*

As noted previously, the trial court in this case expressly found in its ruling that Mr. Bourgeois acted knowingly, intentionally, and outrageously when he appropriated the Special Warranty Deed and interfered with the contractual relationship between the Whalens and the Bones. The trial court included in its written judgment that Mr. Bourgeois's actions were "intentional and egregious." Mr. Bourgeois argues that because the trial court did not describe his actions as "malicious," awards of punitive damages could not be warranted. We note that the standard requires the plaintiffs to prove clear and convincing evidence of *either* intentional, fraudulent, malicious, or reckless behavior on the part of the defendant. *See id.* Mr. Bourgeois admitted that he intentionally appropriated the Special Warranty Deed as "leverage" to obtain $900.00 in rent from the Whalens. He testified that he believed after speaking with an attorney on the morning after the closing that he had a right to reclaim the deed if he returned his uncashed check for the purchase price. The trial court did not find this testimony credible.

We discern no evidence in the record that would lead us to disturb the trial court's findings regarding witness credibility. *See Jones,* 92 S.W.3d at 838 (noting that the trial court's determinations regarding witness credibility shall not be disturbed absent clear and convincing evidence to the contrary). We also note that according to Mr. Bourgeois's own testimony, he was an experienced real estate investor and broker who had participated in

hundreds of real estate closings. The trial court found that Mr. Bourgeois had intimidated staff at US Title into giving him the Special Warranty Deed, and Ms. Hatch's testimony supported this finding. We agree with the trial court's finding that Mr. Bourgeois acted intentionally, as with the "conscious objective or desire to engage in the conduct or cause the result," when he appropriated the deed and interfered with the contractual relations between the Whalens and the Bones. *See Hodges*, 833 S.W.2d at 901.

Mr. Bourgeois also argues that the trial court erred by finding liability for punitive damages because the court "allowed itself to be misled by preconceptions of the case." He cites comments made by the trial court at the opening and closing of trial to the effect that this was "the silliest lawsuit" and "outlandish" to have arisen over the $900.00 rent dispute, particularly when Ms. Hatch testified that she offered to waive US Title's fee in order to avoid a dispute. This argument is without merit. We have been cited no authority that would prohibit the trial court from noting the small percentage of the total funds involved in the property sale that became the focus of Mr. Bourgeois's actions or the number of times he had an opportunity to avoid legal action before it was initiated.

Once a defendant's liability for punitive damages has been established, as in this case, the trial court must immediately conduct a second phase of the trial to determine the appropriate amount of punitive damages. *See Culbreath*, 44 S.W.3d at 527 (citing *Hodges*, 833 S.W.2d at 901). As our Supreme Court explained in *Culbreath*:

> During this second phase, the factfinder shall consider, to the extent relevant, at least the following:
>
> (1)    The defendant's financial affairs, financial condition, and net worth;
>
> (2)    The nature and reprehensibility of defendant's wrongdoing, for example
>
>     (A)    The impact of defendant's conduct on the plaintff, or
>
>     (B)    The relationship of defendant to plaintiff;
>
> (3)    The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;
>
> (4)    The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

-22-

(5)     The expense plaintiff has borne in the attempt to recover the losses;

(6)     Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7)     Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8)     Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9)     Any other circumstances shown by the evidence that bear on determining the proper amount of punitive award.

*Hodges*, 833 S.W.2d at 901-02. In applying these factors, the trier of fact must consider "that the primary purpose of a punitive award is to deter misconduct, while the purpose of compensatory damages is to make the plaintiff whole." *Id.* at 902.

In jury cases the trial judge must review the jury's award of punitive damages and "clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed." *Id.* In non-jury trials, such as the pending case, the trial judge's findings of fact and conclusions of law are equally essential. In the absence of sufficient findings of fact and conclusions of law as to each of the relevant *Hodges* criteria, an appellate court cannot adequately review the trial court's award of punitive damages.

*Culbreath*, 44 S.W.3d at 527-28 (footnote omitted).

In the case at bar, the trial court failed to conduct a second phase of the trial to determine the appropriate amount of punitive damages to award the plaintiffs. The court did expressly state in its ruling that it was "not going to treble" compensatory and prejudgment interest damages pursuant to Tennessee Code Annotated § 47-50-109 and was instead "going

-23-

to allow punitive damages" in the amount of $55,000.00 in favor of the Whalens and $40,000.00 in favor of the Bones pursuant to the common law tort of intentional interference with contractual relations. Other than its general findings regarding Mr. Bourgeois's culpability warranting punitive damages, as noted above, the trial court did not consider the respective factors for the amount of damages set out in *Culbreath* and *Hodges*.

For this reason, we remand to the trial court with specific instructions to conduct a hearing in which the trial court shall reassess the amount of punitive damages awarded to the plaintiffs by considering and making specific findings of fact according to the *Culbreath* and *Hodges* criteria. *See, e.g., Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 374 (Tenn. Ct. App. 2005) ("Since the Trial Court failed to make such findings and did not conduct the proper analysis in this case, the issue of punitive damages is remanded and the Trial Court is directed to comply with the requirements of *Hodges* and *Culbreath*."). On remand, the parties should be allowed to present additional evidence relative to the factors for determining the amount of punitive damages. *See Wilkerson v. Wilkerson*, No. W1999-01684-COA-R3-CV, 2000 WL 633462 at *2-3 (Tenn. Ct. App. May 11, 2000) (affirming the trial court's consideration of additional proof regarding the value and distribution of marital assets on remand from this Court) (quoting *First Tennessee Bank Nat'l Assoc. v. Hurd Lock and Mfg. Co.*, 816 S.W.2d 38, 40 (Tenn. Ct. App. 1991) ("'[T]his court, in its original opinion, envisioned and intended that the trial judge, on remand, take all action necessary to do complete justice, including the reception of additional proof.'")).

## VII. Discretionary Costs

Mr. Bourgeois contends that the trial court erred by awarding $1,324.81 in discretionary costs to the plaintiffs because the award included a fee paid to the expert witness, real estate appraiser Chris Jackson, whose testimony Mr. Bourgeois asserts should not have been allowed. He further argues that the trial court sufficiently provided for the plaintiffs' expenses through awards of compensatory and punitive damages. The plaintiffs contend that the discretionary costs awarded were all clearly allowed by Tennessee Rule of Civil Procedure 54.04(2). We agree with the plaintiffs on this issue.

The plaintiffs filed a post-judgment motion for discretionary costs on June 7, 2013. Following a hearing conducted on June 20, 2013, the trial court granted the motion as to all requested costs except a $400.00 fee paid to Mr. Jackson for completing the appraisal of the Property. The court found this $400.00 to be a fee paid to an expert witness in preparation for trial and accordingly denied it pursuant to Tennessee Rule of Civil Procedure 54.04(2). The remaining costs granted to the plaintiffs included the following:

| | |
|---|---|
| Court Reporter Expense, Depositions: | $1,008.15 |
| Expert Witness Fee, Appraiser Chris Jackson: | 200.00 |
| Court Reporter Fee, Trial and Memorandum Opinion: | 116.66 |
| TOTAL | $1,324.81 |

Tennessee Rule of Civil Procedure 54.04(2) provides in pertinent part:

> (2)  Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable necessary court reporter expenses for depositions or trials, reasonable necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

Recovery of expert fees does not include fees incurred for trial preparation. *Shahrdar v. Global Hous., Inc.*, 983 S.W.2d 230, 239 (Tenn. Ct. App. 1998) (citing *Miles v. Marshall C. Voss Health Care Ctr.*, 896 S.W.2d 733 (Tenn. 1995)). A trial court will generally grant the prevailing party reasonable discretionary costs when requested through a timely, properly supported motion. *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 84 (Tenn. Ct. App. 2000).

Having concluded that the trial court did not err by allowing expert testimony as to the market value of the Property, we cannot agree with Mr. Bourgeois's assertion that the court erred by awarding discretionary costs for the expert's appearance at trial. Mr. Bourgeois does not object to the trial court's finding that the discretionary costs were reasonable. We determine that the trial court did not abuse its discretion by awarding the plaintiffs $1,324.81 in discretionary costs in addition to the damages awarded. *See Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d at 85 ("Awards of discretionary costs are not intended to punish the defendant either for its conduct that caused the litigation or for its conduct during the litigation. Rather, they represent another step toward making an injured plaintiff whole.").

VIII. Vesting Title to the Property

Mr. Bourgeois contends that the trial court erred by vesting title to the Property in him rather than the Whalens. He concedes that he had no right to attempt a unilateral rescission of the purchase and sales contract. He argues that because the trial court ruled that sale of the Property was complete, the appropriate remedy would have been to grant the plaintiffs specific performance and issue a decree divesting title to the Property from Mr. Bourgeois

and vesting it in the Whalens pursuant to Tennessee Rule of Civil Procedure 70.[5]  The plaintiffs do not address this issue directly on appeal except to state that they are not appealing the trial court's ruling.  We conclude that the trial court did not err by vesting title to the Property in Mr. Bourgeois.

In their initial complaint and ultimately in their final amended complaint, the Whalens requested specific performance of the purchase and sales contract as well as compensatory and punitive damages for, *inter alia,* intentional interference with the contractual relationship between the Whalens and the Bones.  During closing argument at trial and in response to questioning from the trial court judge, the plaintiffs' counsel stated that the plaintiffs were "seeking compensation, not specific performance."  Counsel explained that the plaintiffs had "elected damages" as set out in their "calculation of damages" submitted to the trial court.  In its ruling at the close of trial, the court expressly found that damages, rather than specific performance, constituted an equitable remedy.  In its final judgment, the trial court provided in pertinent part:

> [It is hereby] ORDERED that Quint Bourgeois shall receive the residence and real property located at 1516 Airport Road, Oakdale, Morgan County, Tennessee, which property shall be subject to the judgment liens of the Plaintiffs as set forth in this judgment.  Said property is hereby vested out of Whalens and into Bourgeois.

In electing damages as a remedy, the plaintiffs evoked the doctrine of election of remedies, which "is implicated when two inconsistent and irreconcilable remedies are available to the plaintiff to redress a single wrongful act."  *See Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 906 (Tenn. 1999).  As our Supreme Court has explained:

> Tennessee Rule of Civil Procedure 8.01 "grants a plaintiff wide latitude in pleading alternative claims for relief and pursuing an array of theories of recovery in a single action." *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 906 (Tenn. 1999).  This allows Plaintiffs to seek redress both under common law and under the Tennessee Consumer Protection Act.  However, in certain circumstances, a plaintiff is required to elect between remedies.
>
> The election of remedies doctrine has two general applications:
> (1) a plaintiff may be estopped from pursuing additional

---

[5]Tennessee Rule of Civil Procedure 70 provides in pertinent part: "A decree for specific performance shall, if so ordered by the court, operate as a deed to convey land located in this state, or, in appropriate cases, other property, without any conveyance being executed by the vendor."

remedies once a plaintiff has made a choice to pursue a specific remedy in another forum or lawsuit, and (2) a plaintiff may be forced to elect between different remedies "where the remedies are so inconsistent or repugnant that pursuit of one necessarily involves negation of the other."

*Forbes v. Wilson County Emergency Dist. 911 Bd.*, 966 S.W.2d 417, 421 (Tenn. 1998) (internal citations omitted). "For election of remedies to apply, the two remedies sought must be truly repugnant to one another." *Allied Sound, Inc. v. Neely*, 909 S.W.2d 815, 822 (Tenn. Ct. App. 1995). The purpose behind the election of remedies doctrine is to prevent "double redress" for a single wrong. *Forbes*, 966 S.W.2d at 421.

*Miller v. United Automax*, 166 S.W.3d 692, 696-97 (Tenn. 2005).

The trial court in this case found that Mr. Bourgeois did not breach the purchase and sales contract because that contract was completed when the Special Warranty Deed was executed at closing. The court could not therefore grant a remedy of specific performance as to the purchase and sales contract. Even if, *arguendo*, the trial court could have awarded specific performance of the purchase and sales contract, the decision of whether to make such an award would have been within the sound discretion of the trial court. *See Lane v. Assoc. Hous. Developers*, 767 S.W.2d 640, 643 (Tenn. Ct. App. 1988) (noting that the remedy of specific performance of a real estate sales contract "rests in the sound discretion" of the trial court). We note that such an award would have been truly repugnant to the elected remedy of compensatory damages insofar as it would have provided double redress, both the Property and its lost value, to the Whalens. The trial court did not err by vesting title to the Property in Mr. Bourgeois, subject to the plaintiffs' judgment liens.

## IX. Conclusion

For the reasons stated above, we vacate the trial court's award of punitive damages in the amount of $55,000.00 to the Whalens and $40,000.00 to the Bones and remand to the trial court for reassessment of the amounts to be awarded based upon the factors delineated in *Culbreath*, 44 S.W.3d 518 and *Hodges*, 833 S.W.2d 896. The trial court's judgment is affirmed in all other respects. Costs on appeal are assessed equally, one half collectively to the plaintiffs and one half to the defendant, Quint Bourgeois.

_____
THOMAS R. FRIERSON, II, JUDGE

-27-